# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| THOMAS MCLAUGHLIN, TIM FLAHERTY, JAKE FLAHERTY, and MICHAEL MIGLIO, | ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. _____ |
| v. | ) ) | **JURY DEMAND** |
| BROCK PIERCE and SCOTT WALKER | ) ) | |
| Defendants, | ) ) | |

## <u>ORIGINAL COMPLAINT</u>

1.     For more than a decade, Brock Pierce and Scott Walker have worked together to enrich themselves at the expense of their investors, employees, and contractors who mistakenly viewed them as luminaries in the Cryptocurrency industry with specific insight as to which new Crypto projects were likely to succeed.  Rather, Pierce and Walker made some good bets in the early wild west days of Crypto, but have not matured with the industry.  Instead, the growth and sophistication of the blockchain industry and technology has passed them by, leaving them to run pump and dump schemes between drug and alcohol induced benders and illegal high stakes poker games.

2.     They tarnished their once well-respected brand, DNA, by promoting one worthless meme coin after another, ignored corporate formalities and the competent professionals they hired, and intentionally destroyed their own business to avoid sharing money with their investors.  As Crypto continues to grow up, it needs to put fraudsters like Pierce and Walker in its rearview mirror for good.

Case 3:26-mc-09999    Document 241    Filed 03/13/26    Page 1 of 43 PageID #: 11433

## PARTIES

3.      Plaintiff Thomas McLaughlin is an individual residing in New Jersey.

4.      Plaintiff Tim Flaherty is an individual residing in Arizona.

5.      Plaintiff Jake Flaherty is an individual residing in Arizona.

6.      Plaintiff Michael Miglio is an individual residing in Colombia.

7.      Defendant Scott Walker is an individual residing at La Plaza Stella, 1362 Av Magdalena, PH 1904, San Juan, PR 00907.

8.      Defendant Brock Pierce is an individual residing at 902 Villa Dorado Estates, Dorado, PR 00646.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

10.      Venue is proper and the Court has personal jurisdiction over the Defendants because a substantial part of the events or omissions giving rise to the claim occurred in Tennessee and the Defendants committed tortious acts in the State of Tennessee.

## FACTS

**I.      Brief History of Crypto Currency**

11.      Cryptocurrency (colloquially "Crypto") is the general name for a digital currency designed to work through a computer network without reliance on any central authority. Individual coin ownership records are stored in a digital ledger or "blockchain," a computerized database maintains transaction records to verify coin ownership. Bitcoin was the first cryptocurrency, released in 2009, and remains the most well-known. As of June 2023, there were more than 25,000 other cryptocurrencies in the marketplace and, according to Wikipedia, as of April 2025, the cryptocurrency market capitalization was estimated at US$2.8 trillion.

12. Since its foundation, Crypto has been viewed skeptically by much of the mainstream media marketplace. Once routinely described as a financial tool of criminals and the black market or a Ponzi scheme, over the years, Crypto has grown more reputable. In April 2021, Coinbase, a Crypto exchange became a publicly traded company in the United States on the NASDAQ exchange with an initial market capitalization of $85 billion. On June 9, 2021, El Salvador became the first country to adopt bitcoin as legal tender. Crypto was becoming mainstream.

13. A new type of Crypto called a "stable coin" has also come to prominence. Rather than float in the market, stable coins are pegged to the value of the U.S. dollar. The most well known stable coin is called Tether, which has surpassed Bitcoin as the most traded global cryptocurrency. In 2024, Cantor Fitzgerald CEO Howard Ludnick confirmed that Cantor is the custodian of Tether's U.S. Treasury reserves, reportedly in excess of $97.6 billion. Tether is currently in the middle of a capital raise at a valuation of $500 billion.

## II. DNA I

### A. Early Business Deals Between Pierce and Walker

14. Defendant Brock Jeffrey Pierce is a former child actor who appeared in Disney films including *The Mighty Ducks* (1992) and *D2: The Mighty Ducks* (1994). After acting, he became a video game entrepreneur and then ventured into Crypto. He was elected as a Director of the Bitcoin Foundation in 2014 and is a co-founder of Tether, a U.S. dollar–pegged stablecoin project. He is also the person who presented Jeffrey Epstein with the opportunity to invest $3 million in Coinbase before its IPO, which may have netted Epstein's estate up to $100 million, and lived with convicted pedophile Marc Collins-Rector, who was also Pierce's business partner for several years. In 2018, HBO's *Last Week Tonight With John Oliver* called Pierce a

p. 3

"creepy cowboy from the future," described his "entirely unicorn wedding" at Burning Man, and showed him promoting a company with the line, "Everything that exists is no longer going to exist in the way that it does today… Everything in this world is about to be better." Pierce also ran for U.S. President as an independent candidate in 2020.

15. Defendant Scott Walker began his tech career in 1995 founding NetPage Communications, an early web-hosting company. After selling it in 1997, he continued as a serial entrepreneur with companies including, but not limited to "www.content.ad," a "$50m+ online 'Native Advertising' agency," and Extrinsic, Inc., a digital content and online marketing service.

16. Walker and Pierce began working together in the Crypto industry in 2012 when they co-invested in a bitcoin mining operation. In Walker's words, he and Pierce were "early stage ICO investors" who helped launch crypto projects "since 2013." In that year, Pierce co-founded Crypto Currency Partners, along with brother P. Bart and W. Bradford Stephens and with Walker as a founding limited partner. Crypto Currency Partners was one of the first venture capital firms focused on Crypto investments. In 2015, Crypto Currency Partners rebranded as Blockchain Capital. Blockchain invested in many significant Crypto companies including, but not limited to Kraken, Ethereum, Coinbase, and Tether.

17. During the same time period, Pierce and Walker began working on Initial Coin Offerings, known in the Crypto industry as "ICOs." ICOs are a method of raising capital where a Crypto startup sells digital tokens using blockchain technology to investors. Essentially, instead of selling stock, the company sales digital tokens or "coins." Pierce was one of the founders of Mastercoin and Pierce and Walker worked together to lead Mastercoin's public fundraise in July 2013, representing the first ICO. Mastercoin represented the technological foundation for Tether, of which Pierce was a co-founder. A year later, in 2014, the Ethereum ICO (without Pierce or

Walker) raised $18.3 million, setting the stage for an ICO boom in the years that followed.

18. Unfortunately, not all coins launched as part of an ICO represent real companies. The most well known is "Dogecoin," which launched as a joke based on an internet meme of a dog in December 2013 to make fun of the wild speculation in nascent cryptocurrencies. Dogecoin increased in value by 300% in 72 hours in December 2013, then dropped by 80% three days later. But despite the lack of any actual company underlying Dogecoin, it continues to exist, with a peak market capitalization of $50 billion in 2021 following tweets about it by Elon Musk.

19. The ICO market, where a joke could turn into $50 billion, was ripe for investor abuse. As a result, Pierce left Blockchain and formed a new company with Walker, known colloquially as DNA (and, with DNA Holdings Ventures, Inc., "DNA"),[1] in 2017. Pierce and Walker marketed DNA as a "crypto venture fund" that "provides investment and consulting for the world's top crypto projects."

20. ICO activity peaked, with over $6 billion raised, that same year. During this time period, according to the DNA website, Walker and Pierce co-founded and invested in Block.one/EOS, an ICO that raised $4 billion – still the largest ICO in history. The price of one EOS token peaked at $22.89 in April of 2018, with a total market cap of over $17 billion. Today, EOS has lost more than 99% of its value, with an EOS token (now renamed Vaulta) priced around 8 cents. But DNA and its investors apparently got out early, as the today, the DNA website boasts of "Over a 100X return to the team's investment" in Block.one/EOS. DNA also invested in Hedera Hashgraph and achieved a return of "50X to the team." Of course, it is unclear where Walker and Pierce end and DNA begins as they have operated, and continue to operate, DNA as their alter

---

[1] It is unclear if the 2017 DNA is the same legal entity as DNA Ventures Holdings, LLC, but the distinction is immaterial for this lawsuit.

ego.  So the investments touted on the DNA website may be Walker/Pierce personal investments, DNA corporate investments, or some combination of the two.

### B.      Walker and Pierce Get Sued - Repeatedly

21.      Walker and Pierce also used DNA to invest in and/or advise a number of less reputable projects.  For instance, in 2017 and 2018, a project known as Blockchain Terminal (sometimes referenced through its ICO token, "BCT") was marketed and promoted in the digital-asset ecosystem, and later became the subject of a federal securities enforcement action alleging fraud.   And a 2019 report discussing marketing for Blockchain Terminal stated that "BCT's advisors at DNA Fund (Scott Walker and Brock Pierce)" provided advice regarding marketing and roadshow activities – problematic issues that resurface later as described below.

22.      In the fall of 2018, Pierce and Walker became involved in a project called Casper Labs.  According to a lawsuit filed against them in July 2021,[2] Walker, Pierce, and others fraudulent inducted the founder of Casper Labs, Mr. Vlad Zamfir, to allow them to use his name and image in their own marketing campaigns in exchange for "fundraising services and to source and close donations from third parties."  While Walker and Pierce proceed to use Zamfir's likeness in their marketing, they never raised any money for Casper Labs: "Although Defendant Walker repeatedly informed Mr. Zamfir of sponsors supposedly interested in supporting his Casper research, no funds ever materialized."  According to the lawsuit, Walker later entered into an agreement with Casper where 7% of all Casper tokens would be split between himself and three other individuals, with disclosure to the public market.  Further, and also according to the lawsuit, "[u]pon information and belief, the [] coins [provided to Walker for free] are among the first to

---

[2] *Coordination Technology Ltd. v. CasperLabs LLC, et al.* (Case No. 21-cv-01295) (S.D. Cal. July 19, 2021), Original Complaint.

become freely tradeable." Then, Pierce (and others) allegedly "paid persons and entities on YouTube and elsewhere to promote the purported merits of the CasperLabs coins. These promoters rarely revealed that they were paid endorsers of CasperLabs." "Beginning on or about May 6, 2021, IOU token sales and the [] Brock Pierce [] promotion campaign drove the price of the 'Casper' coin, which was still untradeable, from approximately $1 to more than $20." When trading finally began on the 'Casper' coins, "[a]pproximately 590,000,000 'Casper' coins sold between May 11 and May 12, 2021. Despite the broad sell-off, Executive Defendants, Brock Pierce, and Swiss Board Defendants dumped approximately 120,000,000 to 140,000,000 'Casper' coins onto the cooperating exchanges [], further driving down prices." The lawsuit was voluntarily dismissed shortly after it was filed.

23. Pierce was also sued in May 2020 as part of a securities class action lawsuit arising out of allegations that Pierce (and others) misled investors concerning Block.one/EOS. For instance, "[o]On March 12, 2018, before Defendants had any functional software, former Block.one partner Brock Pierce said about EOS:

> Everything will be better, faster, and cheaper. Everything will be more connected. Everything will be more trustworthy. Everything will be more secure. Everything that exists is no longer going to exist in the way that it does today. Everything in this world is about to get better.

In fact, the lawsuit alleged,

> This statement was false and misleading because, in fact, the EOS Blockchain was not more trustworthy and secure. In fact, it did not possess the key feature that would make it trustworthy and secure: decentralization. In particular, Defendants failed to disclose that the EOS Blockchain governance system consisting of a revolving door "block producers" could be overridden by a single "arbitrator," who had the power to reverse transactions and freeze accounts. In addition, the voting framework of the EOS Blockchain made it susceptible to placing power in large token-holders, as ultimately happened when it was declared to be controlled by a small group of "Chinese oligarchs."

Ultimately, the lawsuit resulted in a $22 million settlement.

24. Walker and Pierce were also sued in Nevada in 2022 in connection with a transaction wherein the Plaintiff invested in Wax tokens, Everpedia tokens, and Ethereum through Walker and Pierce's DNA entity. According to the lawsuit, Pierce and Walker refused to transfer control of the tokens acquired to the Plaintiff, which would have allowed him to sell the tokens. Instead, he was forced to watch the value of the tokens decline without being able to take any action.

25. Walker and Pierce were also "advisors" to Blockchain Terminal, a notoriously fraudulent company and ICO. Pierce and Walker used DNA to promote Blockchain Terminal at Crypto Invest Summit LA in 2018. It turns out that Blockchain Terminal was run by a convicted Canadian fraudster, Boaz Manor, using a fake name who had previously bilked investors out of $800 million. While neither Walker, nor Pierce, appear to have been sued in connection with their work for Blockchain Terminal, Manor and some of his associates were indicted in 2020 after investors lost all of their money.

## III. Illegal Gambling Activities

26. As part of their scheme to mislead potential investors and business partners about their supposed success and status as Crypto luminaries, Pierce and Walker hosted two illegal high stakes Crypto poker games at Pierce's home in Dorado, Puerto Rico in 2021. The first in October and the second during Puerto Rico BlockChain Week in December 2021. Walker started a WhatsApp chat group to pr0omote the events, the first of which included a "1.0 [bitcoin] buy in" game. Walker and Pierce worked with "Jacob L," "Limitless Pedro," "Lee Jones," "Poker Unicorns," "Zach Resnick," "Charles," "Austin," "Sam," "Quin," and multiple other people to promote and run the games. The second game, on or around December 9, 2021, was purportedly to benefit the "Integro Foundation," a non-profit where Pierce serves as the Chairman, with Integro

p. 8

getting a minimum of $1,000 per entrant.

27. Approximately one week before the event, nearly 50 people had signed up. The event promoters promised to give people additional chips for both the tournament and a side cash game if they referred guests who signed up to participate including $250 for each tournament entry. The highest stakes cash game had a minimum buy in of $100, 000 and the organizer expected participants would fill two tables and buy in "for $200k from the sound of it, but we are not limiting max buy in for those tables." Despite the more the rake of tens of thousands of dollars going from the game to a charity and the additional money promised to players from the promoters, the poker game was not registered with the Puerto Rican Gaming Authority.

28. The game took place as scheduled on December 9, 2021, with millions of dollars gambled across all tables. The 1 bitcoin entry fee for the tournament was paid into one of the organizer's crypto wallets. On information and belief, cash game entry fees were also paid in crypto currency into an organizer's crypto wallet.

29. The following day, December 10, 2021, one of the participants in the game reported that his iPhone had been hacked through the wifi network created for game participants and his sim was "swapped," giving the hackers access to his email and social media accounts. Others quickly reported that none of the winners received their payouts. Rather, on December 10, 2021, Resnick purportedly received a message from "Jacob" wherein Jacob admitted to stealing all of the money and said he was giving it to his family and committing suicide. All participants were skeptical of the story.

30. It is now more than four years later. Jacob has never been found and the money (on information and belief, $2-$3 million) never recovered. On information and belief, the charity did not receive anything. On information and belief, despite multiple requests from game

participants, neither Pierce nor Walker ever called the FBI to report the theft.[3]

## IV.    Crypto Knights

31.    Plaintiff Mike Miglio is a cryptocurrency attorney, entrepreneur, and blockchain innovator known for his work at the intersection of law and decentralized technology. He is the co-founder of the crypto-focused law firm Wolfe Miglio and previously helped launch ICO Law Group in 2017, two of the early legal practices dedicated to advising blockchain startups, token offerings, and cryptocurrency exchanges during the early cryptocurrency era. Miglio earned his Juris Doctor from Indiana University Maurer School of Law and has worked internationally in Bangkok and Singapore. Beyond legal practice, Miglio is a pioneer in decentralized finance infrastructure as both a founder and an investor of highly technical blockchain based companies. His career centers on helping emerging blockchain projects navigate complex regulatory environments while advancing decentralized financial systems.

32.    In or about June 2024, Miglio was approached and selected to appear as a contestant on a television program titled "Crypto Knights," a Shark Tank style reality show in which founders of crypto-related startups pitch their businesses to a panel of prominent crypto-industry investors identified on the program as "Knights." After Miglio was cast, and unrelated to Miglio, Brock Pierce agreed to participate as one of the show's featured "Knights," serving as an on-camera judge and prospective investor.

33.    The show's format required contestants to present live pitches and negotiate potential investments from the Knights on camera. The negotiations and investment discussions were unscripted and live, without rehearsals or re-shoots, and the offers made on the program were

_____

[3] Neither Walker, nor Pierce are suspected of stealing the millions of dollars in Crytpo from the poker game.

presented as real commitments. More than twenty contestants pitched during filming. When Miglio appeared to pitch his company, it was disclosed on air that Miglio and Pierce knew each other through their overlapping residency and social circles in Puerto Rico. At the time of filming in or about August 2024, Miglio and Pierce had no prior professional relationship and were, at most, acquaintances who had interacted briefly on a handful of occasions at events or gatherings.

34. At the end of Miglio's pitch, live on the show, Pierce was the first to speak. Pierce stated that he loved Miglio's company ("DEIN"), that it was an innovative solution to a problem that sorely needed to be solved within crypto. Pierce offered Miglio, live on recording, to fill the entire $750,000 fundraising round that Miglio was raising on the show. Pierce then stated that if any of the other four "Knights" wanted to join the fundraising round, he would be willing to lower his investment to make room for them. All four of the other investors expressed interest to varying degrees, and Pierce lowered his commitment to $250,000 in total.

35. After filming, Miglio followed up with the "Knights" concerning the proposed investments. Pierce, however, was unresponsive for weeks. Miglio sought assistance from the show's directors to obtain a response from Pierce, and both Miglio and the directors attempted over the ensuing months to confirm and document Pierce's on-camera investment commitment. The directors advised Miglio that Pierce was not responding to them either, and stated that absent follow-through they would be forced to address publicly that Pierce was not honoring the investment commitments made on the program. Shortly thereafter, Pierce took steps to manage the situation by (i) creating a group chat that included Miglio and representatives of DNA in connection with the proposed investment, even though DNA had not agreed to assume Pierce's commitment, and (ii) representing to the show's directors that he and or DNA would support the show financially and assist with introductions through Pierce's entertainment-industry contacts in

connection with efforts to secure a second season.

36. The group chat did not result in Pierce honoring the on-camera investment commitment. DNA informed Miglio that DNA would not assume or guarantee Pierce's investment obligation, and Pierce remained largely silent despite Miglio's repeated attempts to obtain a definitive answer. Instead of assuming Pierce's investment obligation, DNA made Miglio an objectively terrible offer wherein they asked for 1-2% of Miglio's company and in return they would try to help Miglio raise funds from other potential investors (not Pierce), however they would not invest themselves; Miglio declined. Miglio reiterated that Pierce's failure to follow through reflected poorly on him and DNA, and that Pierce or DNA should complete the investment. In lieu of funding, DNA made a final offer to list DEIN on a webpage within DNA's "Deal Desk," a platform where accredited investors can purportedly invest alongside DNA in portfolio companies. At this point, Miglio accepted their offer to be put on the webpage because it cost him nothing and it represented a small chance at raising some funding after all he had been put through, however DNA did not invest in DEIN, DNA did not meaningfully market DEIN to investors through the Deal Desk, and no capital was raised for DEIN through that channel.

37. Miglio ultimately stopped pressing Pierce to fulfill the commitment to avoid escalating a conflict with Pierce. This unresolved issue later resurfaced when Miglio was approached to join DNA, at which time Pierce and Walker made vague but emphatic assurances that they would improve DEIN's financial situation and help raise capital, including statements to the effect that Miglio's affiliation with DNA would be a key factor in DEIN's success. However, once Miglio joined DNA, Walker told Miglio that he should abandon DEIN and focus full-time on DNA instead, stating that DEIN did not have anywhere near enough capital to make it (largely because Pierce did not fund his commitment and DNA ultimately did not help DEIN the way they

promised they would).

38.     Regarding the investment into Crypto Knights that Pierce promised the show, this was again shifted into a "DNA deal" instead of Pierce taking personal responsibility for it. The show relied on the promise that Pierce and DNA would make this investment, and they aired the show without exposing Pierce's failure to invest. On the show, Pierce made more than 8 investment commitments in projects, often promising the most amount of money of any of the investors, making himself look wealthy and eccentric on the show. On information and belief, as of a year after the show, Pierce has not fulfilled any of his investment obligations, to the detriment of the projects that relied on his promises to invest.

## V.     DNA II

### A.     Walker and Pierce Relaunch DNA

39.     Despite all of the lawsuits filed against them and their poker game resulting in the theft of millions of dollars, Pierce and Walker remained well-known figures in the Crypto industry. So, in 2024, Pierce and Walker created a traveling meeting and party venue dubbed "DNA House" that they took around the world to solicit investment in a revamped DNA and promote ICOs that paid them to make sham investments in various tokens. Pierce and Walker refined their pitch throughout 2024 beginning on a private yacht they rented for TOKEN2049 Dubai on April 18–19, 2024. Plaintiff Jake Flaherty attended TOKEN2049 on DNA's behalf and officially became a DNA employee in May 2024. Pierce and Walker awarded Jake Flaherty 375,000 options at a company valuation of $25 million and told him, through Chris Miglino, the DNA CEO at the time, that DNA would be going public within a year or two at a valuation of between $300 million and $1 billion, so Flaherty's options would be really valuable.

40.     Also in mid-2024, Plaintiff Tim Flaherty met Walker, who told him that he, Pierce,

and DNA had been incredibly successful investing in Crypto projects between 2015 and 2019. Walker said they took a break between 2019 and 2024 due to a bear crypto market and told their employees to "go to the beach." However, with a strong Crypto bull market in 2024, Walker said they planned to put the band back together and launch "DNA 2.0." Walker said he and Pierce would both source deals from their networks and that all good Crypto deals go through either him or Pierce because of their great reputation in the industry. At no point did Walker tell Tim Flaherty that "DNA 1.0" actually lost money for its investors. Flaherty and his wife, Paige Larkin, agreed to invest $750,000 and wired the money in April 2024. Flaherty's friend Briston Peterson invested $250,000.[4]

41. Meanwhile, in early 2021, Plaintiff Thomas McLaughlin founded Coral Capital Management, LLC ("Coral"). Coral operated as an asset manager giving investors exposure to blockchain investments. Walker became Coral second largest investor, and McLaughlin got to know him on a personal level, playing golf and attending hockey games together and taking many social trips. By 2024, Coral had raised $2.57 million in GP capital to cover its expenses and had $125 million in assets under management after completing a capital raise at a $40 million valuation. McLaughlin owned 33.3% of Coral before the capital raise and 27% of Coral after the capital raise. With the relaunch of DNA, McLaughlin and Walker entered into discussions and negotiations concerning a potential acquisition of Coral by DNA with the shared belief that DNA and Coral would be more valuable together than each was separately with DNA providing a venture track record and brand presence, while Coral would operate and manage liquid strategies and day-to-day business operations. McLaughlin brought his whole team to Consensus Austin to

---

[4] Flaherty's wife, Paige Larkin, and Peterson's entity, Point Golf Markers, LLC have assigned Flaherty the right to pursue any and all causes of action against Pierce and Walker.

meet Walker and Pierce's newly formed DNA team.

### B. Misrepresentations at Bitcoin 2024 in Nashville

42. Walker and McLaughlin's conversations continued into the biggest Crypto conference of 2024—Bitcoin 2024 in Nashville, Tennessee from July 25 to 27. The annual Bitcoin conference brings together almost all major participants in the Crypto industry, and 2024 was no different. Featuring speeches by President Trump and HHS Secretary Kennedy, Bitcoin 2024 included dozens of panels and presentations on the evolution of Crypto. The conference attracted thousands of participants from across the United States and around the world. Pierce and Walker were both there, running their own parallel conference and party at DNA House, which occurred at the Cannery House in downtown Nashville.

43. DNA House represented a grand smoke and mirror show by Walker and Pierce. Featuring a mechanical bull, multiple DJs playing in multiple rooms, live bands, and open bars, DNA House gave the false impression that Walker and Pierce had created an extremely financially successful entity. In fact, DNA's previous investors (other than Walker and Pierce) had never received any return on capital.

44. Walker told McLaughlin that DNA was about to go public through a reverse merge transaction with a company called SRAX and the combined company would have immense value because Walker and Pierce were about to inject between approximately $100 million of assets (the "Assets") into the new public company. He also warned McLaughlin that, if the company's did not merge, Walker would be pulling his assets out of Coral because he needed them to inject into the new company. As a result, McLaughlin was inclined to merge Coral into DNA.

45. McLaughlin participated in the events hosted by Pierce and Walker at "DNA House" in Nashville, with Walker introducing him as part of the Pierce/Walker team even though

the acquisition of Coral had yet to be formalized.  Walker and Pierce had promised McLaughlin that he and Coral would benefit by falling under the DNA umbrella because the two of them would help McLaughlin raise capital for his funds.  Nashville represented one of the first such opportunities – but, contrary to promises from Walker and Pierce, McLaughlin did not gain many new investors or investment capital from his participation.

46.     Rather, in Nashville, Pierce and Walker both gave multiple presentations.  They pitched investors on six DNA II funds, including the "Helix Opportunity Fund," which would be "directly managed by legendary investors Brock Pierce and Scott Walker."[5] Pierce and Walker gave investors "a few specific examples of DNA Fund investments from 2017-2024."  They touted a profit of approximately $14 million from Block.one (EOS) shares, $35 million from HBAR tokens, and $5.8 million from FXS tokens.  Yet, despite these astronomical returns, investors in DNA (other than Pierce and Walker) lost money, receiving back only 70 cents for each dollar invested.   Significantly, nowhere in the pitch deck do Pierce and Walker disclose that their previous DNA investors lost money.

47.     Pierce and Walker also compared their company, DNA, to Galaxy Digital ("Galaxy"), one of the first digital asset treasuries, or "DATs."  In their Nashville presentation, they noted, "DNA and GLXY both launched formally in 2017, the DNA team invested into the GLXY IPO in 2018- Our bankers were planning the IPO for DNA next. The 2018 market crash derailed our plans. GLXY got out, DNA did not."[6]  In 2024, DATs like Galaxy were valued at up to 3.4 times net asset value.  Walker and Pierce further told investors, "DNA is planning a reverse into a US Shell with an uplist to NYSE- Our raise is $3M on a $100M pre."  In other words,

---

[5] *See* Exhibit 1, July 2024 Presentation at 13.
[6] *Id.* at 31.

p. 16

Case 3:26-mc-09999   Document 241   Filed 03/13/26   Page 16 of 43 PageID #: 11448

Walker/Pierce/DNA already had $100 million in digital assets. They told investors that, if they could raise $3 million in cash, they would take the company public, and (presumably) receive the same bump in value as Galaxy, almost immediately tripling the value of the company. None of that ever happened.

48. The fraudulent statements made by Pierce and Walker in Nashville, before Nashville, and after Nashville were designed to induce investment into DNA as means of attracting unsuspecting investors to give them money to support their luxurious lifestyle, private jets, private yachts, five-star hotels, and worldwide parties paid for with investor money.

49. Further, despite advertising six "funds,"[7] DNA had not actually created (and did not ever create) most of the "funds." For instance, while the BTC & ETH Multiplier Fund and Moonshot Fund were concepts considered by DNA personnel, DNA never created actual funds implementing those two strategies. And the High Yield Fund and Liquid Token Fund were McLaughlin funds siloed within DNA, meaning that an investor had to specifically invest in one of those funds to receive benefits. Ultimately, persons investing in DNA as a whole did not receive exposure to, or benefit from, either fund. And McLaughlin, even though he had given up ownership in his own entity, did not receive any benefit from investments into DNA.

50. As a result, investor money solicited by Pierce and Walker for DNA could only be used for the Helix Fund and the Liongate AI Fund. But neither fund was actually formally created, registered, or even managed in any formal way. Rather, Helix Fund represented Walker's personal investments. Sometimes Walker and Pierce would have DNA co-invest with Walker. Sometimes Walker would invite other people to co-invest separate and apart from DNA. Either way, Walker normally received better terms than any investor that invested through DNA (as detailed below).

---

[7] *Id.* at 12.

The relationship between Walker and Helix Fund provides further evidence of the alter ego relationship between DNA and Walker/Pierce.

51.     Meanwhile. the Liongate AI fund was supposed to focus on "early stage VC investments" in the AI space, but was instead used to enter into a long term contract with a public company (White Fiber: WYFI), a subsidiary of Bit Digital (NASDAQ: BTBT) where Pierce serves on the Board of Directors.  The White Fiber debacle is detailed below.

52.     As an additional part of their Nashville presentations, Pierce and Walker discussed DNA's "Investor Community: Management, Marketing and Awareness" operations including "in-person events."  Specifically, Pierce and Walker told investors that they "specialize[d] in curating premier events worldwide, bringing together investors, Web 2 and Web 3 projects, as well as private and public companies."  In other words, Pierce and Walker threw great parties around the world—but they neglected to mention that they wanted investors in DNA to pay for those parties.

### C.     Self Dealing ICO Transactions

53.     Walker and Pierce also said, "[b]eyond networking, we offer deep dives into emerging projects, ensuring that attendees are equipped with the latest insights and knowledge to navigate the evolving landscape of technology and finance."  Those "deep dives into emerging projects" form the centerpiece of Pierce and Walker's current scheme to enrich themselves at the expense of their investors, contractors, and employees.

54.     Specifically, given Pierce and Walker's reputation in the Crypto industry, many ICOs believed it was advantageous to have Walker and Pierce's names associated with their new tokens.  But Pierce and Walker did not select tokens in which to invest based on the underlying operational fundamentals of the companies promoting the tokens, rather they chose investments based on the kickbacks offered by the ICOs.  Presumably through the mythical Helix Fund, Pierce

and Walker would "invest" money received from their DNA investors into the ICOs in exchange for equity and ICO tokens subject to transfer restrictions. But DNA investors were never told how much exposure they had to the Helix Fund or any deal contained within it. DNA would often promise to invest in other companies through Helix Fund, even signing subscription documents, but Walker would fail to either contribute the required capital or raise it from other people.

55. In exchange for the "investment" from DNA, the ICOs would promise to "sponsor" DNA House events – essentially, sending them investment dollars in the form of their own self-branded Crypto meme coins or tokens that DNA could sell to defray the costs of the lavish parties at DNA House and private jet travel and private yacht rentals for Pierce and Waler (and their friends/romantic partners). Rather than pay for such travel, Walker and Pierce had DNA foot the bill. Additionally, on information and belief, Pierce and/or Walker would receive a kickback in the form of cash and/or advisory tokens for themselves, often at better terms than those provided to DNA and its investors. Specifically, on information and belief, Pierce and/or Walker's tokens would often vest earlier than DNA's, allowing Pierce and/or Walker to liquidate their tokens for cash ahead of DNA. Meanwhile, Walker and Pierce would use DNA as a platform to promote the token and then, as soon as the DNA tokens/coins "vested," Walker/Pierce/DNA would sell the tokens (while still promoting them). As in any "pump and dump" scheme, the token price would typically drop, leaving the investors solicited by Walker/Pierce/DNA at a severe economic disadvantage in comparison to Walker/Pierce/DNA. And, on information and belief, sometimes leaving DNA and its investors at a disadvantage compared to Walker and Pierce.

56. For instance, DNA signed an advisory agreement with EstateX whereby EstateX gave DNA 2.5% of all of its tokens, which vested over time. Then DNA began promoting EstateX. Once the first tranche of DNA tokens vested, DNA sold them for $167,000 while continuing to

encourage investors to purchase EstateX tokens.  Between when DNA sold and today, EstateX tokens lost 96% of their value.  Meanwhile, EstateX also had an advisory agreement with Pierce through another one of his entities and, on information and belief, Pierce also sold his EstateX tokens while DNA was promoting EstateX and encouraging investors to purchase the EstateX tokens.

57.     Walker also solicited investments in a company called Bitcoin OS.  DNA invested $1.75 million and Walker solicited money from other investors, including Tim Flaherty, to invest apart from DNA.  Flaherty gave Walker $100,000 to invest.  But rather than investing it in Flaherty's name, Walker invested Flaherty's money, along with Walker's own and possibly money from other investors, in his own name: a total of $1 million.  Walker promised that he would transfer tokens and/or cash to Flaherty as soon as it was released by the company.  Flaherty received his first allocation in January, one of 12 scheduled releases, but has not received tokens or cash over past two months.  Additionally, on information and belief, Walker received a personal advisory agreement granting him advisory tokens that became liquid well before the tokens available to DNA and the individual investors, which were not saleable until 2026.

58.     On information and belief, Walker and Pierce also falsely pumped up a company called Chintai by claimed to have made a $150,000 investment in Chinai.  As an SAS platform company, Chinai's public valuation was based on a multiple of its annual revenue and, on information and belief, $150,000 represented a substantial portion of Chintai's revenue.  Chinai's stock price spiked to 68 cents per share when its partnership with DNA was announced in early December 2024.  But Walker and Pierce never planned from DNA to actually pay Chinai anything, let alone $150,000.  Instead, Chinai was simply providing services to Walker/Pierce/DNA for free in exchange for DNA's promotion of Chintai.  Once investors figured it out, Chintai's price

plummeted and now sits around 2 cents per share.

### D.     The Pump and Dump Scheme and "Deal Desk"

59.     Buried in their DNA website, Pierce and Walker admit to their unconscionable behavior and attempt to "disclaim" it.  First, they say they are "paid advertisers, also known as stock touts or stock promoters, who disseminate favorable information (the 'Information') about publicly traded companies."  The concept sounds reasonable.  But then Pierce and Walker go on to say that they receive the Information from the promoted company itself: "The Information is provided to us by the Profiled Issuers."  And they "do not verify or confirm any portion of the Information. We do not conduct any due diligence, nor do we research any aspect of the Information including the completeness, accuracy, truthfulness or reliability of the Information." In other words, Pierce and Walker are willing to act as mouthpieces to pump up the price of a company's stock. Meanwhile, they admit that they will profit by acting contrary to their own recommendation to investors by "sell[ing] the shares [they] hold while we tell investors to purchase during the Campaign."

60.     And, most shockingly, they explicitly admit to running "pump and dump" schemes: "A short time after we acquire a Profiled Issuer's securities, we may publish the (favorable) Information about the Profiled Issuer advising others, including you, to purchase; and while doing so, we may sell the Profiled Issuer's securities we acquired during our public dissemination of the Information causing us to profit while you suffer a loss."  Further, "[w]hen we sell the shares of the Profiled Issuers that we hold, the price at which investors can sell their shares will dramatically decrease and will likely cause investors to suffer trading losses."  Finally. "[i]f an investor relies on the Information [provided by Walker and Pierce] in making an investment decision it is highly probable that the investor will lose most, if not all, of his or her investment."

61. Walker and Pierce cannot cover the illegality of pump and dump schemes by disclaiming liability for such unconscionable actions. Walker and Pierce committed an act of wire fraud every time they utilized DNA to make a social media post about an ICA or a token and the personally profited by selling those tokens as part of each "pump and dump."

62. While in Nashville, Walker and Pierce also encouraged potential investors to check out DNA's website, which contains additional examples of wire fraud. For instance, the website tells investors they can "[i]nvest alongside DNA founders in the Helix Fund—early access to the next wave of top-tier crypto and web3 opportunities"; with pictures of Pierce and Walker and a list of some of their investments, headlined by Tether, the "world's largest Stablecoin with over $140B in USD." The website also notes that "[t]he team initial investment in Tether (under $100K) is now worth up to $300,000,000 (over 3,000X)." That $300 million investment is among the Assets (defined below) that Pierce contributed to DNA.

63. On the website, Walker and Pierce announced the Walker would be personally managing the fund: "the first ever Helix Fund managed by Scott Walker." DNA solicited investors with the statement, "[i]n 2025 for the first time Brock and Scott are opening up a fund and allowing outside investors to come in and invest alongside these two legends." Of course, that statement was not true as Brock and Scott had already raised outside money both years earlier and again in 2024.

64. In December 2024, DNA announced the creation of its "Deal Desk" to promote "a carefully selected lineup of top web3, AI, and crypto projects." Deal Desk was supposed "to offer accredited investors and qualified purchasers flexibility in managing and accessing tokenized assets." And Pierce and Walker promised that DNA would "carefully vet[] all projects featured on DNA Deal Desk before projects are tokenized." Of course, this promise is in direct opposition

to the disclaimer on their website where they say, "[w]e do not conduct any due diligence, nor do we research any aspect of the Information including the completeness, accuracy, truthfulness or reliability of the Information."

65. In fact, Walker and Pierce did virtually no due diligence on the companies before agreeing to promote the companies. DNA would sign an advisory agreement with a company. DNA would create an SPV through which investors could get exposure to a particular token by investing through the DNA Deal Desk. DNA kept 2% of any investment as a management fee. Then Walker/Pierce/DNA would solicit investors from their mailing list(s) to invest in the SPV through Deal Desk. Once the company's tokens went live, DNA would sell them (while continuing to promote the tokens to other investors), generating a return for their SPV investors, with DNA keeping 20% of the profit. Of course, the tokens had virtually no value after the period of "pump and dump" promotion ended. Deal Desk provided a formal means for Walker/Pierce/DNA to "pump and dump" meme coins/tokens.

### E. Defrauding McLaughlin

66. Based on Walker and Pierce's false representations, including but not limited to their representation that the Tether Rights (defined below) would be contributed to DNA, McLaughlin agreed to merge Coral into DNA and the transaction was finalized in October 2024. When the deal closed, DNA required cash for legal fees, technology, and salary obligations, and used money from Coral's GP to cover such expenses, without disclosing that need to Coral in advance. Coral contributed $1.3 million in cash along with all of its assets under management. McLaughlin had no idea that DNA had virtually no cash on hand as Walker and Pierce misrepresented DNA's financial conditions in negotiations with him (while promising that they would be contributing $100 million in Assets). As a result, almost immediately, Walker and Pierce

used Coral's money to pay DNA expenses, along with their own luxury travel expenses which were embedded within DNA. DNA owed the Coral GP holders approximately $350,000 and took nearly six months to make payment, harming McLaughlin's reputation. Walker and Pierce also prevented DNA from paying $470,236 in 2024 performance bonuses due to McLaughlin and other former Coral employees, further harming McLaughlin's reputation.

67. In an effort to prioritize investors, McLaughlin and his team took no shares in DNA and took no cash, instead allowing Coral GP investors to receive the full economic benefit of the combination, including a 2.88% ownership interest in DNA. To induce McLaughlin to give up his company to Walker and Pierce without any immediate economic benefit, Walker and Pierce had a handshake agreement to give McLaughlin shares in DNA as part of a plan to contribute over $100 million of their own Assets into the company and take it public. But, as set forth below, Walker and Pierce reneged on their commitment. Additionally, rather than helping McLaughlin raise capital for the funds he had placed within DNA, Walker and Pierce focused on extracting advisory terms and tokens from ICA projects and leveraging the former Coral's team and operations in service of their own broader fundraising and business objectives. McLaughlin quickly realized that Walker and Pierce had misled him about the financial stability of DNA and that it had burned through most of the cash raised from investors for lavish parties and luxury travel, but remained hopeful that everything would turn out ok once Pierce and Walker contributed the promised $100 million in Assets and DNA became a public company.

**F.     Hiring a Professional Leadership Team**

68. Of course, all of Walker and Pierce's problems would be solved if they could just take DNA public as a "digital asset repository" or "DAT" and convince the public to value the

company at a multiple of its assets on hand. Walker and Pierce routinely touted the success of Galaxy Digital ("Galaxy"), one of the first DATs.

69. Recognizing their need for a lawyer with a strong Crypto background as they sought to take DNA public, Walker and Pierce met with Miglio at DNA House during the 2025 Bitcoin conference in Las Vegas on May 27, 2025. They told Miglio DNA needed a lawyer because they were taking DNA public, and would provide Miglio salary plus equity that would be worth millions of dollars, perhaps tens of millions. They also directly stated that joining DNA and helping DNA achieve its goals would help Miglio's own personal project, DEIN, a crypto project that created a decentralized marketplace for insurance and risk. As discussed above, Pierce already had an unfulfilled investment obligation to DEIN. Pierce and Walker promised to help Miglio raise capital for DEIN and generally assist in its success as a DNA portfolio company. These promises were never fulfilled.

70. Conversations continued into June 2025 and Miglio requested 2% equity in DNA (approximately 2,000,000 shares) given the amount of work necessary to complete the public offering. Walker rejected that request, telling Miglio that he and Pierce had committed to inject at least $50 million each into the company, for approximately $100 million total. Walker represented that most employees and contractors were receiving approximately 100,000 options, but offered Miglio 300,000 options due to the importance of his role. That representation was false, and Miglio later learned, after accepting a deal to work for DNA and getting access to the data room, that almost every employee and contractor had at least 300,000 options.

71. Miglio countered at 1,000,000 shares, and Walker responded that DNA already had a public vehicle it intended to use for a public offering and that within two months Miglio. Walker stated that 400,000 options was the maximum he would offer along with a payment of $10,000 per

month from DNA, with a promise to increase the cash component to $20,000 per month after a supposedly imminent capital raise for DNA (that never occurred).  Miglio accepted the offer to work for DNA based on the two-month timeline for a public offering.  At no time did Miglio represent Pierce or Walker personally.   Walker also represented that the Assets he and Pierce planned to contribute were heavily undervalued and that the shares would trade for at least $10 per share by the time DNA went public, portraying Miglio's equity as immediately worth approximately $4,000,000.

72.     Shortly after Miglio joined, DNA brought on Shawn Matthews as the new CEO of DNA in July.  Matthews is a highly respected financial-services executive who served as CEO and President of Cantor Fitzgerald & Co. from 2009 to 2018.  As with Miglio, Pierce and Walker induced Matthews to join, in part, by repeating their promise to contribute $100 million or more of Assets into the company without diluting him or the company.  Matthews brought James Nash, a highly qualified finance executive that became DNA's CFO.  Walker and Pierce told Nash that DNA had large equity capital behind it through Pierce and Walker.

73.     During the Summer of 2025, DNA also negotiated to acquire a company called BitAgent in exchange for approximately $10 million in cash and ownership in DNA.  Then, on a call with Miglio on the expected closing date,  Walker told BitAgent personnel that they had to take a lower percentage of ownership in DNA because he and Pierce were on the verge of contributing hundreds of millions of dollars of assets into DNA and taking it public, making DNA much more valuable.  Based on that representation, BitAgent closed the deal with DNA at on the new terms proposed by Walker.

74.     Together with other members of the DNA team, Matthews, Nash, and Miglio undertook extensive efforts to plan and execute DNA's path to becoming a public company at the

request of Pierce and Walker. The strategy involved identifying a publicly traded company with limited assets and operations – a "Shell." DNA would then merge into the Shell, contributing all of its assets and taking over the company. At the time, DNA had limited assets as Pierce and Walker had yet to contribute their promised $100 million in Assets and, without those Assets, no merger would be possible as DNA had virtually no other assets other than those contributed by Coral (and worthless meme coins/tokens).

75. Matthews and others identified prospective Shell vehicles and led diligence efforts on those targets, Nash began the process of preparing the Company for audit and audited financial reporting, and Miglio reviewed, drafted, and advised on hundreds of contracts that governed DNA's legal obligations and commercial relationships, while attending hundreds of calls and meetings. The $100 million in Assets Pierce and Walker promised to inject into DNA also came up in every negotiation with shell company prospects as the Assets had to be contributed before DNA could go public.

76. In August 2025, prior to hiring Nash as CFO, DNA hired a consulting company called Flexible Consulting to assist with accounting work and Flexible Consulting continued to provide line level accountants to assist Nash in the Fall of 2025. Nash and Flexible Consulting quickly determined that, contrary to the representations of Pierce and Walker, DNA was not adequately capitalized apart from the promised Assets, with at least two accountants resigning along the way. Specifically, Walker and Pierce originally capitalized the company with millions of dollars of their stock holdings in a publicly traded company called SRAX, Inc., with the plan to merge DNA into SRAX. But by October 2025, SRAX was literally a penny stock, trading between a high around 1 cent per share down to a November 2025 low of 1/10 of 1 cent per share. In other words, the supposed millions of dollars in equity contributions from Pierce and Walker were

p. 27

completely worthless. Even so, Pierce and Walker owned over 80% of DNA, while the investors who contributed millions of dollars, McLaughlin, who contributed a profitable entity, and DNA employees who contributed their sweat equity, owned very little. Even worse, Flaherty and other DNA investors had no idea that Pierce and Walker had not capitalized DNA with cash.

77. Nash also determined that DNA's "advisory" and "events" services were losing millions of dollars a year because DNA had been booking revenue in the form of meme Crypto coins received from the Crypto companies Walker and Pierce agreed to "promote," not actual cash. On information and belief, of the approximately 36 agreements that DNA entered into to promote Crytpo companies, not a single one resulted in a successful company or profitable outcome and those companies Crypto coins had no value – even though DNA had booked substantial revenue based on "payment" in meme Crypto coins.

78. In fact, as of the Summer and Fall of 2025, only McLaughlin's business unit (that he brought from Coral) was generating positive income for DNA. DNA had little to no cash on hand, other than cash contributions provided by Walker and a loan agreement with a usurious interest rate of 40%-60% annually.

**G. Long Overdue Contribution of Assets**

79. DNA simultaneously courted multiple public shell companies including, but not limited to EVTV, VIVS, and SONM. The identify of the particular shell company was irrelevant to the corporate strategy – all that mattered was that the shell was already publicly listed as DNA would be contributing more than $100 million in Assets for the new public company.

80. In August, when DNA was deep into negotiations with VIVS as its top choice of public companies to merge with, it was evident that the asset transfer was a material part of the merger. In an email dated August 4th, 2025, subject line "DNA / VIVS Transfer Assets", the firm

p. 28

representing VIVS asked the DNA Team in a group email for the "schedule of assets that will be deposited". To which Scott Walker replied "[w]orking on final as we speak.. Give me one or two days and we will have it for you.." and Walker was "deep into the asset list for you".

81. On September 22, 2025, Pierce and Walker entered into an agreement (the "Written Consent") whereby they promised all other DNA shareholders that they would "contribute significant personal assets to [DNA] to assist it in its goals" in exchange for shares of preferred stock to "facilitate growth and potentially engage a merger that would lead to public market transactions."

82. Then, on September 28, 2025, Pierce and Walker entered into an agreement with DNA ("Agreement for the Contribution of Additional Capital Assets") whereby they formally agreed to transfer the Assets to DNA including, but not limited to 199 coins of bitcoin, 9.32% of BCAP Fund I LP, a 27.5% distribution interest of BCAP Fund II GP, a 1.02% interest in BCAP Fund II LP, 237,637 shares of BCAP Fund III LP." Most significantly, the BCAP Fund II GP interest included the profit interest tied to, on information and belief, 5% of the shares in Tether (the "Tether Rights"), which Pierce and Walker describe on their website as worth "$300 million." The Agreement for the Contribution of Additional Capital Assets explicitly put in writing the promises Walker and Pierce has been making for nearly a year: DNA "requires additional assets to facilitate a potential merger transaction with a NASDAQ-listed company which is the subject of current negotiations." As noted above, DNA's entire team had been focused on negotiating such a merger for months, with Matthews identifying various possible Shells. Unbeknownst to investors, Walker and Pierce also added a clause permitting them to take the Assets back if the NASDAQ merger was "not consummated by March 27, 2026."

83. Pierce and Walker sent the Written Consent to Flaherty and potentially other

investors, but failed to send the Agreement for the Contribution of Additional Capital Assets. In doing so, they intentionally concealed the possibility that they could take the Assets back from DNA as such an act would have been inconsistent with their promises to Flaherty, Miglio, McLaughlin, and many others. As a result, each mailing constituted an act of mail fraud.

84. The Agreement for the Contribution of Additional Capital Assets did not actually cause the contribution of Assets to occur. Rather, each of Walker and Pierce had to take additional steps to formally contribute the Assets to DNA. Rather than contribute his Assets directly, Pierce transferred several of the Assets, including, the Tether Rights from one entity he owned, Percival Services, LLC to another entity that may have been formed for that specific purpose: RNA LLC. Then Pierce contributed the ownership interest of RNA LLC to DNA.

### H. White Fiber, POAI, and AGPU: the ATH Fraud

85. As set forth above, Walker and Pierce had DNA enter into a long term contract with a company called White Fiber. Rather than mining Crypto tokens, White Fiber mines new "AI tokens" known as "Aethir" or "ATH." Walker and Pierce committed DNA (and DNA investor money) to a multi-year contract whereby DNA would pay White Fiber to mine Aethir for DNA. Unfortunately, because the price of Aethir has not risen as they expected, Walker and Pierce are paying White Fiber millions of dollars more to mine each Aethir token than it is worth – guaranteeing a large recurring monthly loss for DNA. Despite the obvious conflicts of interest since Pierce is on the Board of Directors of White Fiber's parent company, it appears Walker and Pierce took no steps to protect their investors from losses at the expense of Pierce's company. Rather, they doubled down.

86. Specifically, Walker and Pierce entered into a partnership with a company called Predictive Oncology Inc. (NASDAQ: "POAI"). On September 29, 2025, POAI and DNA

announced that POAI had supposedly raised $343.5 million through private placements to accumulate ATH, setting itself up as a digital asset treasury for ATH. But only $50.8 million of that capital raise came in cash, with $173.3 million of "in-kind contributions of locked and unlocked ATH," which the company valued at just over $0.59 per ATH, for a total of $292.7 million. DNA is listed as "the strategic adviser and an investor" in the cash portion of the private placement. But the announcement appears misleading as DNA did not have even a fraction of $50 million available to make such an investment, investing only $5 million, which, on information and belief, was contributed by Walker to DNA for that purpose. Regardless, DNA ended up with 7.5% equity ownership of POAI. DNA also received an agreement to manage the assets in POAI in exchange for a recurring fee. And the $50 million in cash was supposed to be used to buy ATH on the open market, propping up the price of ATH.

87. Essentially, POAI became a publicly traded proxy for the value of ATH tokens. Of course, but for the public vehicle holding the "locked" ATH – including DNA's locked ATH – the token was essentially illiquid. When word of the deal leaked, the value of ATH doubled from $0.03 per ATH token to the anticipated deal price – approximately $.06 – in mid-September. Further trading volume increased 8x, from ATH volume of approximately $20,000 per day in August 2024, to average volume of over $160,000 per day between September 9, 2024 ($318K) and September 28, 2024, the day before the official announcement of DNA's involvement.

88. DNA had accumulated 27,796,757.80 ATH tokens as of September 7, 2025. Then, with material non-public information concerning the impending transaction, DNA began to sell large volumes, selling more than 937,000 ATH token on September 8, 2026 and another 2,500,000 ATH tokens on September 12, 2026. DNA continued selling after the official announcement on September 29, 2025, selling two million ATH tokens on October 2, 2025 for over $100,000—a

p. 31

price of \$0.05 per token—nearly 60% higher than the market price before news of the DNA sponsored POAI deal.  Two weeks later, the price of ATH had fallen below \$0.03 per token and it continued to decline to \$0.016 in November 2025.

89.     Walker and Pierce put DNA and its employees in the middle of the mess by appointing Shawn Matthews to the POAI Board of Directors and appointing McLaughlin as its Chief Investment Officer on October 14, 2025.

90.     As of Nov. 10, 2025, POAI reported \$44.5 million in cash and only \$145.9 million of ATH tokens, for total assets of approximately \$190 million – dramatically less than the supposed \$343.5 million investment POAI touted a month earlier.  At the same time, POAI announced that it had used \$25 million of the \$44.5 million in cash to buy 927.9 ATH tokens at a price of \$0.027 per token, temporarily propping up the price of ATH. But less than two weeks later, on November 21, 2025, POAI reported that its 5.6 billion ATH tokens had decreased in value to only \$90 million, or \$0.016 per token.

91.     POAI entered into a reverse merger with Axe Compute, Inc. in October 2025 and changed its NASDAQ ticker to AGPU in December 2025.  AGPU exists, at least from Walker and Pierce's perspective, to prop up the value of ATH to allow Walker and Pierce to sell the millions of tokens they accumulated in DNA through their contract with White Fiber.  DNA transferred its AGPU shares into a brokerage account at the direction of Walker and/or Pierce and/or DNA's President, Chris Miglino.  DNA's CFO, Nash, told them that DNA could not sell those shares given its activities in promoting the AGPU stock and its insider status.

92.     On January 12, 2026, DNA announced AGPU as a sponsor of its January 2026 investor summit in Puerto Rico.  Then, on January 15, 2026, Walker and Pierce allowed DNA to publish supposed "in-depth research on Axe Compute" attempting to pay it back for the

sponsorship and prop up AGPU's share price. AGPU "surged 17.11% intraday" to $9.00 per share on the release of DNA's report and trading volume . But the increase was short-lived as AGPU gave back all of its gains the following day and closed at $6.43. On information and belief, DNA's report contained inaccurate and misleading data concerning AGPU and its release constituted an act of wire fraud. Mysteriously, it appears DNA's report is no longer available online.

93. Matthews resigned as a Director of AGPU the same day as the DNA "report," with McLaughlin resigning as Chief Investment Officer of AGPU two business days later. Then Nash resigned as CFO of DNA on Tuesday, January 20, 2026. As of March 6, 2026, AGPU's stock is down even further to $1.83. And ATH tokens are down to $0.006, meaning that the value of POAI's ATH is now only $33.6 million. Meanwhile, DNA finally terminated its White Fiber contract, but still owes it millions of dollars.

### I. The Plan to Recover the Tether Rights

94. Soon after he contributed the Tether Rights, Pierce began taking actions to try and reclaim them. Specifically, during the Fall of 2025, Tether announced a plan to raise $15-$20 billion at a $500 billion valuation. The $500 billion valuation represented an increase of approximately 16 times the valuation used for the Tether Rights on Pierce's balance sheet, bringing the value of Pierce's interest in the Tether Rights to, on information and belief, more than a billion dollars. As he only owned 44% of DNA, he quickly regretted contributing all of his Tether Rights to DNA as the potential increased value of the Tether Rights meant that Piere contributed substantially more Assets than Walker.

95. On December 16, 2025, two members of Pierce's team initiated a call with Matthews, Miglio, and outside counsel for DNA, William Hughes. Pierce's personnel stated a desire to withdraw all but $50 million of Pierce's contributed Assets from DNA. Eventually,

Walker and Pierce joined the call and Walker told Pierce that both he and DNA would sue Pierce if he attempted to withdraw any of the Assets. Likewise, Hughes stated that the various agreements precluded Pierce from removing any Assets from DNA at that time.

### J. The Destruction of DNA as a Viable Business

96. Within the next day or two, it appears Walker and Pierce reached a mutually beneficial understanding at the expense of Flaherty, Miglio, McLaughlin, and many others. First, Walker and Pierce failed to take actions necessary to allow DNA to complete its audit, including, but not limited to supplying money to pay for accounting staff and auditors and giving Nash access to information to validate the Assets, causing Matthews and Nash to resign as CEO and CFO, respectively. Second, Walker and Pierce directed DNA to stop pursuing a NASDAQ merger for the entirety of DNA (as required under the Agreement for the Contribution of Additional Capital Assets). Instead, they began a plan to merge the part of DNA within McLaughlin's responsibility (the only profitably part of DNA) with Sonim ("SONM"), a NASDAQ entity. Such a merger would allow Walker and Pierce to withdraw their Assets and abandon the remainder of DNA (and all of its liabilities). Third, Walker fired Miglio. Fourth, Walker and Pierce laid off most of DNA's staff.

97. The plan to tank DNA was evident in Walker and Pierce's decisions throughout December 2025 and January 2026. For instance, Jake Flaherty sourced three potential advisory deals where the Crypto companies would agree to pay cash up front plus tokens in exchange for DNA's help in marketing and growing their companies. Walker and Pierce rejected all of the deals. Additionally, on information and belief, two individuals expressed interest in investing at least $10 million in cash into DNA. Walker and Pierce immediately rejected both deals.

98. Walker and Pierce completed their plan of merging *part* of DNA into a NASDAQ

company, placing DNA's digital asset trading platform into SONM in December 2025. Then, on January 27, 2026, Sonim announced it would be renamed "DNA X, Inc." But Pierce and Walker did not transfer any of the Assets from DNA to DNA X.

99. On January 26, 2026, Pierce and Walker directed Chris Miglino to lay off approximately 75% of DNA staff, including Jake Flaherty and Miglio. Then Pierce and Walker fired Miglino as well.

100. Then, on a Zoom call in early February 2026, Walker told remaining DNA employees that their shares in DNA were worthless, that he and Pierce were in process of selling or taking a loan against the Tether Rights, which would give DNA $25 million of cash to cover operational expenses, and that they were focused on DNA X.

101. On February 12, 2026, Plaintiffs sent a litigation hold letter to Walker and Pierce and demanded redemption of their shares in DNA. Walker and Pierce declined the demand.

102. DNA's counsel stated that the Assets remained within DNA and that DNA has not encumbered the Assets, but was unable to make any representations as to whether Pierce had individually taken any actions to encumber any Asset. Pierce did not respond in writing to Plaintiffs' request for such a confirmation. Most troubling, the attorney stated that, from Walker and Pierce believed they could take the assets back from DNA at any time: "Under our interpretation of this Agreement, there is currently no impediment to such a transfer."

103. March 27, 2026 is only a few weeks away and, on information and belief, Walker and Pierce plan to withdraw the Assets from DNA on or around that date, depriving Plaintiffs (and other DNA investors) of value promised to them by Walker and Pierce. Wherefore, concurrently with this lawsuit, Plaintiffs are filing a motion for temporary restraining order and preliminary injunction to prevent Walker and Pierce from removing the Assets from DNA or taking any other

action to transfer or encumber the Assets during the pendency of this lawsuit.

## CAUSES OF ACTION

### COUNT 1: Violations of RICO: 18 U.S.C. § 1962(c)
### (By All Plaintiffs Against All Defendants)

104.    Plaintiffs incorporate all of the allegations in the preceding paragraphs by reference as if fully set forth herein.

105.    The RICO Enterprise consists of an association and group of individuals associated in fact (Pierce and Walker) for the unlawful purposes of defrauding investors, potential investors, employees, and potential employees investors through the instrumentality of DNA and otherwise by promoting themselves as experts and luminaries in the Crypto industry.  The Defendants are among the persons associated with the RICO Enterprise.

106.    As set forth above, and pursuant to and in furtherance of their fraudulent scheme, the Defendants agreed to and did conduct and participate in the conduct of the RICO Enterprise's affairs through a pattern of racketeering activity by:

- Fraud in the sale of securities with respect to selling ownership interests in DNA and selling Crypto tokens/coins while simultaneously telling investors to purchase such tokens/coins;

- Transmitting writings in interstate commerce for the purpose of furthering a scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises in violation of 18 U.S.C. § 1343 by posting fraudulent information on the DNA website including, but not limited to the "disclaimers";

- Transmitting writings in interstate commerce for the purpose of furthering a scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises in violation of 18 U.S.C. § 1343 through the use of Deal Desk to pump and dump meme coins/tokens;

- Transmitting writings in interstate commerce for the purpose of furthering a scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises in violation of 18 U.S.C. § 1343 by sending fraudulent emails and/or text messages and/or WhatsApp messages to McLaughlin,

p. 36

Miglio, Jake Flaherty, Tim Flaherty, and others concerning their scheme;

- Engaging in a scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of television communication in interstate or foreign commerce through the Crypto Knights program by promising to invest in Crypto companies including, but not limited to Miglio's company, and failing to do so;

- Transmitting writings in interstate commerce for the purpose of furthering a scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises in violation of 18 U.S.C. § 1341 by mailing fraudulent documents investors including, but not limited to mailing Tim Flaherty, the Written Consent;

- Transmitting writings in interstate commerce for the purpose of furthering a scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises in violation of 18 U.S.C. § 1343 by issuing a fraudulent "report" on Axe Computing, Inc.;

- Working with more than five people (including themselves) to conduct, finance, manage, supervise, direct, or own two poker events in violation of Puerto Rican laws with proceeds exceeding $2,000 in a single day 18 U.S.C. § 1955; and

- Operating DNA as an unlicensed money transmitting business in violation of 18 U.S.C. § 1960 by sending money to Crypto companies and other ICOs and receiving tokens and cash payments back from them. Specifically, Walker, Pierce, and DNA engaged as a business in the transmission of currency, funds, or value that substitutes for currency, including any person who engages as a business in an informal money transfer system or any network of people who engage as a business in facilitating the transfer of money domestically or internationally outside of the conventional financial institutions system" with respect to transactions between Walker, Pierce, DNA, and ICOs and other third-party Crypto companies.

The acts set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

107. The Defendants have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c). The Defendants also used their pattern of racketeering activity to damage Plaintiffs for the purpose of acquiring or maintaining control, directly or indirectly, any interest in or control of DNA, which was engaged in or whose activities affected interstate

commerce in violation of 18 U.S.C. § 1962(b).

108. As a direct and proximate result of the Defendants' racketeering activities and violations of 18 U.S.C. § 1962(b) and (c), McLaughlin has been injured in his business and property as he lost the revenue stream and long term profitability he received from Coral Capital because Defendants convinced him to contribute its assets to DNA. He also lost his 2024 bonus and did not receive the ownership interest in a $100+ million company promised to him by Pierce and Walker. Finally, he has been damaged in his ability to make money in his chosen field going forward due to his association with Walker and Pierce.

109. As a direct and proximate result of the Defendants' racketeering activities and violations of 18 U.S.C. § 1962(b) and (c), Miglio has been injured in his business and property in that he did not receive the ownership interest in a $100+ million company promised to him by Walker and Pierce or the $250,000 promised by Pierce in Crypto Knights. He also has been damaged in his ability to make money in his chosen field going forward due to his association with Walker and Pierce.

110. As a direct and proximate result of the Defendants' racketeering activities and violations of 18 U.S.C. § 1962(b) and (c), Tim Flaherty has been injured in his business and property in that he lost the $1,000,000 invested based on Walker and Pierce's misrepresentations.

111. As a direct and proximate result of the Defendants' racketeering activities and violations of 18 U.S.C. § 1962(b) and (c), Jake Flaherty has been injured in his business and property in that Walker refused and failed to fund his 2025 bonus. He has also been damaged in his ability to make money in his chosen field going forward due to his association with Walker and Pierce.

112. Plaintiff seek judgment under this count for actual damages, treble damages,

disgorgement of profits earned by each of Walker and Pierce, and attorneys' fees.

## COUNT 2: Fraud
### (By All Plaintiffs Against All Defendants)

113. Plaintiffs incorporate all of the allegations in the preceding paragraphs by reference as if fully set forth herein.

114. Walker and Pierce fraudulently induced each Plaintiff into participating in their schemes by investing either their time or money (or both). With respect to McLaughlin, Walker and Pierce fraudulently induced him to contribute Coral to DNA and go to work for DNA in exchange for false promises to give him equity in DNA that would be incredibly valuable because they were contributing at least $100 million in assets to DNA and taking it public.

115. With respect to Miglio, Walker and Pierce fraudulently induced him to go to work for DNA in exchange for false promises that his equity in DNA would be incredibly valuable because they were contributing at least $100 million in assets to DNA and taking it public.

116. With respect to both Jake Flaherty, Walker and Pierce fraudulently induced him to go to work for DNA in exchange for false promises that his equity in DNA would be incredibly valuable because they were building a valuable company and taking it public within a year or two.

117. They subsequently defrauded McLaughlin, Miglio, and both Jake and Tim Flaherty by intentionally destroying the business enterprise of DNA and taking only a portion of DNA public without the valuable Assets.

## COUNT 3: Breach of Covenant of Good Faith and Fair Dealing
### (By All Plaintiffs Against All Defendants)

118. Plaintiffs incorporate all of the allegations in the preceding paragraphs by reference as if fully set forth herein.

119. An implied covenant of good faith and fair dealing exists in every contract, requiring parties to act honestly, reasonably, and in accordance with the agreement's purpose during

performance and enforcement. It prevents one party from acting in bad faith to deprive the other of the intended benefits of the contract, particularly when exercising discretion.

120.     Here, Defendants induced Plaintiffs to enter into various verbal and/or written agreements. Specifically, Walker and Pierce agreed with McLaughlin that he would merge Coral into DNA in exchange for future equity interests in a company with over $100 million in assets. Walker and Pierce acted in bad faith in at least the following ways: (1) delaying placing the Assets in DNA; (2) setting up a mechanism to remove the Assets from DNA without providing any share of them to McLaughlin; (3) merging part of DNA into SONM to form DNA X without including any of the Assets or providing McLaughlin any ownership; and (4) failing to formalize McLaughlin's ownership in any entity with $100+ million in assets.

121.     Walker and Pierce agreed with Miglio to hire him to perform services for DNA in exchange for equity interest in a company with $100+ million in assets. Walker and Pierce acted in bad faith in at least the following ways: (1) delaying placing the Assets in DNA; (2) setting up a mechanism to remove the Assets from DNA without providing any share of them to Miglio; (3) merging part of DNA into SONM to form DNA X without including any of the Assets or providing Miglio any ownership; (4) failing to vest Miglio's ownership in any entity with $100+ million in assets.

122.     Walker and Pierce agreed with Jake Flaherty to hire him to perform services for DNA in exchange for equity interest in a company with $100+ million in assets. Walker and Pierce acted in bad faith in at least the following ways: (1) delaying placing the Assets in DNA; (2) setting up a mechanism to remove the Assets from DNA without providing any share of them to Jake Flaherty; (3) merging part of DNA into SONM to form DNA X without including any of the Assets or providing Jake Flaherty any ownership; (4) failing to vest Jake Flaherty's ownership in any

entity with $100+ million in assets.

123. Walker and Pierce agreed with Tim Flaherty that he would invest in DNA, their alter ego, in exchange for ownership interest in a valuable company. Walker and Pierce did not act in good faith when they intentionally destroyed DNA so they did not have to share the value of the Assets with Tim Flaherty and other DNA investors.

## COUNT 4: Alter Ego
### (By All Plaintiffs Against All Defendants)

124. Plaintiffs incorporate all of the allegations in the preceding paragraphs by reference as if fully set forth herein.

125. Pierce and Walker operated DNA as their alter ego to perpetrate a fraud against Plaintiffs. Specifically, as set forth in the Complaint, DNA was always under the complete control of Walker and Pierce – not only its finances, but also its policies and business practices—it had no separate existence of its own. Walker and Pierce used their control to commit fraud, violate statutes and legal duties, and commit dishonest and unjust acts in contravention of Plaintiffs and other third parties' rights. Such actions proximately caused injury to Plaintiffs in that they lost the expected value of their investment in DNA, a company with hundreds of millions of dollars of assets that should have been going public.

126. Additionally:

- DNA was used to work a fraud in contravention of public policy through pump and dump schemes and otherwise.

- Walker and Pierce failed to pay in capital to capitalize DNA when it started.

- DNA was grossly undercapitalized but for the Assets that Walker and Pierce desire to remove.

- DNA, Walker, and Pierce all utilized William Hughes as their attorney.

- DNA was used as a conduit for Helix Fund, Walker's personal investments.

p. 41

- Walker and Pierce are attempting to divert the Assets out of DNA to benefit themselves at the expense of creditors and other shareholders.

- Walker and Pierce failed to maintain arms-length relationships between themselves, their other entities, and DNA.

- Walker and Pierce used DNA assets to pay for personal expenses such as travel.

- Walker and Pierce used DNA employees to carry out personal business.

127. As a result, the Court should disregard DNA's corporate identity and view it as an extension of Walker and Pierce (as they did themselves), allowing Plaintiffs to recover the lost value of their investment in DNA directly from Walker and Pierce due to their fraud and other unjust behavior.

### COUNT 5: Punitive Damages
### (By All Plaintiffs Against All Defendants)

128. Plaintiffs incorporate all of the allegations in the preceding paragraphs by reference as if fully set forth herein.

129. Because the clear and convincing evidence will show Pierce and Walker acted maliciously, intentionally, fraudulently, and/or recklessly, Plaintiffs are also entitled to punitive damages in an amount to be determined by the jury.

### JURY DEMAND

130. Plaintiff demand a trial by jury.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiff pray that: (i) judgment be entered in their favor, (ii) that judgment be entered against all Defendants, and (iii) relief be granted as follows:

    a. Compensatory damages in an amount to be determined at trial in an amount not less than $50 million;

    b. Disgorgement of profits money unjustly received by Defendants as determined at trial;

c.   Treble damages under RICO;

d.   Punitive damages;

e.   The costs and expenses of this action, including Plaintiffs' reasonable attorneys' fees and any other reasonable professional or expert fees which may be incurred; and

f.   Such other and further relief as the Court deems just and proper under the circumstances.

Dated: March 13, 2026

*/s/ Ryan Downton*_____
Ryan Downton
Texas Bar No. 24036500
THE TEXAS TRIAL GROUP, P.C.
875 Carr 693, Ste. 103
Dorado, PR 00646*
Telephone: (512) 680 7947
Email: ryan@thetexastrialgroup.com
*Downton is licensed in Texas not Puerto Rico

*Attorneys for Plaintiffs*