# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| HIGHER TECH REALTY TN, LLC, d/b/a MARK SPAIN REAL ESTATE,<br><br>Plaintiff,<br><br>v.<br><br>NAVIGATE REALTY, LLC; and JAN COOPER,<br><br>Defendants. | Civil No. _____<br><br><br>**VERIFIED COMPLAINT**<br><br><br>**JURY DEMAND** |

Plaintiff Higher Tech Realty TN, LLC d/b/a Mark Spain Real Estate ("Mark Spain") files this Verified Complaint against Defendants Navigate Realty, LLC ("Navigate") and Jan Cooper ("Ms. Cooper"; together with Navigate, "Defendants").

## NATURE OF THE ACTION

1. Navigate opens its doors in Nashville with stolen keys to success. Unable to outmatch Mark Spain, Navigate—aided by Ms. Cooper—has set out to sabotage Mark Spain's success by stealing its employees, confidential information, and trade secrets.

2. Mark Spain's unique and proprietary agent training and lead generation processes set it apart in the market and allow it to close deals at a much higher rate than competitors, including Navigate.

3. Hoping to break into the Tennessee market without investing any of the time and effort spent by Mark Spain, Navigate decided to raid Mark Spain's leadership team and confidential information.

4. Until mid-April, Ms. Cooper served as a Tennessee-based member of Mark Spain's sales leadership team. Mark Spain required Ms. Cooper to sign a Leadership Team Confidentiality

Agreement and Agreement Not to Compete ("Agreement") to protect its key business interests. Ms. Cooper's Agreement is attached as **Exhibit 1**.

5. The day after leaving Mark Spain, Ms. Cooper joined Navigate as a Vice President of Sales & Recruiting based in Tennessee. Knowing the challenge that she faces in helping a newcomer to the market get off the ground, Ms. Cooper accessed and/or downloaded *hundreds* of files containing Mark Spain's confidential and trade secret materials shortly before she left. She also began actively soliciting Mark Spain's agents to join her at Navigate.

6. Ms. Cooper has scorned her obligations under the Agreement. Her role at Navigate is substantially similar to the one she performed at Mark Spain, violating her promise in the Agreement not to compete against Mark Spain by performing a leadership role for a competing business within Tennessee. By soliciting Mark Spain's agents, she has violated her promise in the Agreement not to recruit its employees. And, by taking Mark Spain's confidential information and trade secrets to use at Navigate, she has violated her obligations under the Agreement to keep that information confidential.

7. But Navigate's poaching of Ms. Cooper is no isolated incident. Navigate—despite knowing of Agreements signed by agents and members of Mark Spain's leadership team—has engaged in a coordinated raid across multiple offices. So far, this strategy has worked—already, four leadership employees and 11 agents have left Mark Spain to join Navigate in North Carolina and Tennessee.

8. Mark Spain brings this action for damages and injunctive relief now that it has learned of the lengths that Navigate and Ms. Cooper have gone to in order to violate its contractual rights and misappropriate its trade secrets. It seeks to stop Defendants' contractual breaches,

tortious conduct, and unfair competition to prevent further irreparable harm to Mark Spain's business.

**PARTIES, JURISDICTION, AND VENUE**

9. Mark Spain is a limited liability company formed and existing under the laws of the State of Tennessee with its principal office located in Franklin, Tennessee.

10. Navigate is a limited liability company formed and existing under the laws of the State of North Carolina. Navigate is authorized to do business in the State of Tennessee and has a registered agent located at 117 Seaboard, Nashville, Tennessee 37067.

11. This Court has personal jurisdiction over Navigate because it has a registered office in this district and because it regularly conducts business in this district such that it has purposely availed itself to the forum, and the harm done by Navigate, as outlined in the Complaint, has affected Mark Spain within this district.

12. Ms. Cooper is an individual who, on information and belief, may be served at 219 Thompson Park Dr., Nashville, Tennessee 37211.

13. Ms. Cooper is a resident of this district and has consented to personal jurisdiction in this Court. (Ex. 1, at 7.)

14. This Court has jurisdiction over the subject matter of this litigation pursuant to, without limitation, 28 U.S.C. § 1331 and 18 U.S.C. § 1836 *et seq*.

15. Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims asserted occurred in the Middle District of Tennessee, and Ms. Cooper consented in her Agreement to venue in the Middle District of Tennessee. (Ex. 1, at 7.)

3

<u>**FACTUAL ALLEGATIONS**</u>

**I.      Mark Spain has a unique and highly successful business model.**

16.      Mark Spain is a leading real estate brokerage specializing in home sales throughout the South.  For the last 15 years, Mark Spain has specialized in connecting residential home sellers with investors.  The results are evident: Mark Spain has been ranked as the top-producing residential real estate firm on the Real Trends 500—an industry benchmark—for five consecutive years.  In 2025 alone, it handled over $3.2 billion in home sales, growing its lifetime sales to over $21 billion.

17.      Mark Spain, like most real estate brokerages, focuses heavily on generating leads, or potential buyers and sellers of real estate.

18.      Mark Spain uses a unique business model for generating leads.  At most brokerages, real estate agents are responsible for generating their own leads.  Mark Spain, however, generates the vast majority of its leads through its comprehensive marketing campaigns, and it uses inside sales associates to convert leads into agent appointments.  This system allows its agents to outpace competitors in securing appointments with prospective clients, averaging roughly eight to 12 appointments per month.

19.      Mark Spain also differentiates itself from competitors through training and recruiting methods, as well as centralized support, including client concierges, transaction coordinators, inside sales, marketing, and investor operations, which it has developed and refined over years in the industry.

20.      In particular, Mark Spain has invested enormous amounts of time, money, and resources into honing its agent training programs.  These proprietary trainings cover everything from onboarding to closing, including client communications; managing buyer expectations;

4

pricing homes; and tailoring the client experience. Mark Spain also closely monitors sales metrics so that it can determine which techniques work best, and it uses the successful techniques to further refine and improve its unique training models. This comprehensive and proprietary training program allows Mark Spain agents to successfully close a massive volume of home sales, often as many as 50 to 100 deals per agent per year.

21. Mark Spain's effective systems, recruiting, and training methodology have made it a target for competitors seeking to "poach" its leaders and agents as a potential shortcut to replicating Mark Spain's commercial success.

22. Navigate is a direct competitor of Mark Spain, and it is currently seeking to expand its footprint. Until recently, Navigate had offices only in North Carolina and South Carolina. But, with Ms. Cooper's help, Navigate has now opened an office in Nashville—in the same building complex as Mark Spain's office.

23. On information and belief, Navigate is also targeting Mark Spain because it seeks to expand its seller-side business. Most of Mark Spain's clients are sellers, whereas Navigate's seller-side business is historically weaker. Because of this, acquiring Mark Spain's lead generation processes would complement Navigate's current business and supercharge its growth.

**II.     Ms. Cooper agreed not to compete with Mark Spain, solicit its current employees, or violate confidentiality.**

24. Mark Spain employed Ms. Cooper as a Director of Sales in its offices in Chattanooga and Nashville, Tennessee, beginning in 2022.

25. Ms. Cooper was not a licensed real estate agent and lacked any experience in the real estate brokerage business before joining Mark Spain. Nor had she ever held a professional leadership position related to buying and selling homes.

5

26. With the benefit of Mark Spain's training, mentorship, and oversight, Ms. Cooper progressed to earn the leadership status she held at Mark Spain prior to her departure.

27. As a Director of Sales, Ms. Cooper was responsible for recruiting, retaining, and training sales agents. She managed a team of 20 to 50 sales agents.

28. More specifically, Mark Spain trusted Ms. Cooper to: (1) create and execute sales strategies that exceeded growth targets while managing market center operations; (2) recruit, train, and lead a top-performing sales team, ensuring ongoing accountability and development; (3) drive agent success through coaching, review of key performance indicators, and consistent accountability sessions; (4) identify and develop high-potential agents and future leaders to support sustainable growth and reduce turnover; (5) lead impactful sales meetings, training sessions, and daily huddles to maintain focus and drive results; and (6) track performance metrics, provide key insights, and ensure strict adherence to company policies and ethical standards.

29. In short, as Director of Sales, Ms. Cooper was responsible for ensuring that agents successfully converted appointments with prospective sellers to listings, and then listings to closings. This required close monitoring of sales metrics for her assigned sales agents, stepping in on challenging deals, monitoring investor relationships and preferences, and participating in recruiting training at least twice a year.

30. Much of Mark Spain's success depends on Director of Sales' oversight of existing sales agents. Ms. Cooper managed every aspect of her agents' hiring, performance, and sales trajectory.

31. Success in the real estate business also depends heavily on relationships—home sellers and investors alike need to trust their broker's professionalism, competence, and reputation. Because of this, Mark Spain expected leadership employees like Ms. Cooper to maintain strong

6

working relationships with agents and intimate knowledge of Mark Spain's investor partners. Mark Spain paid Ms. Cooper over the course of several years to develop and strengthen these relationships.

32. As a member of the leadership team, Ms. Cooper also recruited and trained new leadership team members. This included ensuring that those new hires executed agreements like the Agreement to protect Mark Spain's legitimate business interests.

33. In furtherance of her role, Ms. Cooper regularly accessed and used sensitive and confidential Mark Spain information, including detailed training materials, information about home-buying investors and sellers, marketing strategies, recruiting and selection processes, details on all appointments and closings company-wide, sales performance data, financial metrics, and other confidential and trade secret information. Ms. Cooper also interacted with the group of more than fifty investor partners. These investor partners make possible Mark Spain's guaranteed offer strategy, through which Mark Spain aggregates multiple investor offers and delivers those offers to the client, creating an extremely client-friendly, streamlined process.

34. Moreover, Ms. Cooper received a Mark Spain laptop and email address, which she used to access Mark Spain's confidential information and trade secrets for use in furtherance of her employment.

35. As consideration for her employment in a leadership position at Mark Spain, Ms. Cooper entered into her Agreement on or about March 19, 2022.

36. The Agreement is a valid and enforceable contract.

37. Mark Spain required Ms. Cooper and similarly situated employees to sign the Agreements to protect its legitimate business interests in its confidential information, in

7

relationships with agents, investors, and customers, and its "extraordinary and specialized training." (Ex. 1, at 3.)

38. Ms. Cooper agreed, among other things, that that the Agreement was intended to protect the "Legitimate Business Interest" of Mark Spain, which included "preserving and maintaining the secrecy of Confidential and proprietary Information, relationships with existing customers, prospective customers, current and prospective vendors and suppliers, Leads, …, goodwill, [and] … [the] extraordinary and specialized training provided by [Mark Spain]." (Ex. 1, at 3.)

39. Further, the Agreement makes clear that Mark Spain would "be irreparably harmed by [Ms. Cooper's] breach of the Agreement." (Ex. 1, at 4.)

40. The Agreement also details the various protective covenants, of which four are particularly relevant to this action.

41. First, Section II(1)(a) of each Agreement ("Trade Secret Provision") governs the protection of Mark Spain's trade secrets. The provision reads:

> Protection of Trade Secrets. During the term of this Agreement and after its expiration or early termination, irrespective of the reason for such Termination, Employee will not, except as expressly authorized or directed by Company in writing, use, copy, duplicate, transfer, transmit, disclose or permit any unauthorized person access to, any Trade Secrets, belonging to Company, and its Affiliates, any of Company's clients and customers, any of the Company's business partners, joint venture or affiliated marketing partners, vendors or subcontractors, or any related third party for so long as the information or material remains confidential or a Trade Secret, as applicable. Without limiting the foregoing, Employee will abide by Company's policies and regulations, as established from time to time, for the protection of its Trade Secrets and Confidential Information.

(Ex. 1, at 4.)

42. The Agreement defines "Trade Secrets" consistent with applicable Tennessee and federal law. (*Id.*)*; see also* 18 U.S.C. § 1839(3); Tenn. Code Ann. § 47-25-1702.

8

43. Second, Section II(1)(b) of the Agreement ("Confidentiality Provision") governs the protection of confidential information:

> During the term of this Agreement and thereafter, Employee will not, except as expressly authorized or directed by Company in writing, use, copy, duplicate, transfer, transmit, disclose or permit any unauthorized person access to, any Confidential Information, belonging to Company, any of the Company's clients and customers, any of the customer's business partners, vendors, joint venture partners or subcontractors, or any Affiliate, for so long as the information or material remains confidential or a Trade Secret, as applicable.

44. Confidential Information, as defined in the Agreement, refers to information "of a special and unique nature [that] has tangible or intangible value and which … could be used as a competitive advantage by competitors if revealed or disclosed to such competitors." This includes "the extraordinary and specialized training provided by [Mark Spain] … and work product … that, if disclosed, could also increase the ability of third parties to compete with [Mark Spain]." (Ex. 1, at 2.)

45. In furtherance of Mark Spain's efforts to protect its Confidential Information and trade secret materials, the Agreement also requires that Ms. Cooper "shall immediately return all property of the Company" upon termination of her employment. (Ex. 1, at 6.)

46. Third, in Section II(1)(d) of the Agreement ("Non-Solicitation Provision") Ms. Cooper agreed that she would not:

> Directly or indirectly on [her] own behalf or in the service or on behalf of others, solicit, divert, or recruit any employee, contractor or agent or assist others to solicit, divert or recruit any employee, contractor or agent of Company to leave such employment, whether such employment is by written contract or at will.

(*E*x. 1, at 5.)

47. The Non-Solicitation Provision is effective for two years following the expiration of her employment with Mark Spain. (*Id.*)

9

48.     The Agreement also contains two separate and distinct Non-Compete Provisions: Non-Competition of Employee During Engagement ("While-Employed Non-Compete"); and Non-Competition of Employee upon Termination ("Post-Employment Non-Compete", together, "Non-Compete Provisions").

49.     The While-Employed Non-Compete, Section II(1)(e-1) of the Agreement, contains promises that during the term of the Agreement, Ms. Cooper will not:

> Directly or indirectly on Employee's own behalf or in the service or on behalf of others, or in conjunction with any other person, firm, corporation, limited liability company, or any other business entity, or as an employee, agent, representative, partner, consultant, independent contractor, or holder of any interest in any person, firm, corporation, or any other entity or association, engage in, carry-on, or participate in any Competing Business in the Territory.

(*Id.*)

50.     In Section II(1)(e-2), the Post-Employment Non-Compete, Ms. Cooper promised not to:

> directly or indirectly on Employee's own behalf or in the service or on behalf of others, or in conjunction with any other person, firm, corporation, limited liability company, or any other business entity, or as an employee, agent, representative, partner, consultant, independent contractor, or holder of any interest in any person, firm, corporation, or any other entity or association, engage in, carry-on, or participate in Leadership Team Member Services which are the same or similar in nature for any Competing Business in the Territory.

(*Id.*)

51.     The Post-Employment Non-Compete Provision runs for "a period of three (3) years after" the termination of employment with Mark Spain. (*Id.*) This timeframe is necessary to allow Mark Spain to train new employees to replace leadership employees like Ms. Cooper, who is intimately familiar with Mark Spain's unique training processes and its investor relationships.

52.     The Post-Employment Non-Compete Provision is further limited to Leadership Team Member Services, which are defined in the Agreement as:

10

services provided by a Leadership Team Member in a management role pertaining to: (i) managing and organizing real estate agents and staff, (ii) recruiting and selecting new employees, (iii) revenue generation, (iv) limited agent/staff contract terminations, (v) attending meetings, team and staff retention, (vi) sales forecasting, (vii) handling customer/client issues, (viii) taking responsibility for sales retention, (ix) sales forecasting, (x) Brand building, (xi) Company culture building, (xii) handling and solving customer issues and complaints, (xiii) quality control of real estate listings, (xiv) meetings with the Company's executive team, and (xv) one on one meetings with team members.

(Ex. 1, at 3, 5.)

53. This Post-Employment Non-Competition Provision is not intended to prevent Ms. Cooper from working in the real estate business at all—just to prevent her from working in *leadership roles* elsewhere in a limited sector of the real estate market. Indeed, the provision explicitly permits Ms. Cooper to continue working as "a Real Estate Agent … as long as such activities do not constitute a management role as defined by … Leadership Team Member Services." (Ex. 1, at 5.)

54. Together, the Non-Compete Provisions only apply to the restricted "Territory" of Tennessee and certain counties therein associated with territory Ms. Cooper covered as Mark Spain's employee. (Ex. 1, at 3–4.)

55. This restricted Territory is limited to areas in which Mark Spain regularly does business. Ms. Cooper had access to, and used, Mark Spain confidential information and trade secrets pertaining to this Territory in the scope of her employment with Mark Spain.

56. The separate Non-Compete Provisions are distinct and do not run simultaneously. Accordingly, the Post-Employment Non-Compete is tolled while the While-Employed Non-Compete is effective.

57. Restrictive covenants like those in the Agreement are common in the real estate industry because of the highly competitive market.

11

58. In addition to the various covenants that Ms. Cooper agreed to, she also agreed that she has "undertaken a fiduciary duty to [Mark Spain] as a member of the leadership team for [Mark Spain]." (Ex. 1, at 6.)

### III. As part of her role, Ms. Cooper accessed and used Mark Spain's confidential information.

59. As set forth above, Ms. Cooper promised to keep Mark Spain's confidential information and trade secrets confidential.

60. Ms. Cooper accessed and used extensive Mark Spain confidential information and trade secrets ("Confidential Information") in her leadership role with Mark Spain, including: (1) agent training materials; (2) sales performance and financial data; (3) investment habits and preferences of investors with whom Mark Spain does or has done business; (4) Mark Spain's specialized process for recruiting and selecting sales agents; and (5) confidential details pertaining to Mark Spain's agents' appointments and closings. Mark Spain and its affiliates use this Confidential Information to serve clients and investors in several states, throughout the Mark Spain business footprint.

61. None of this Confidential Information is commonly known in the industry, and it cannot be discovered through independent development or reverse engineering.

62. Due to Mark Spain's unparalleled success in converting leads to offers to sales, competitors like Navigate have scrambled to replicate Mark Spain's process, including its training regimen, recruiting protocol, and lead generation and conversion methods.

63. But competitors like Navigate are facing an uphill battle. Mark Spain has made a massive investment in its Confidential Information and in its employees and agents to optimize its efficiency, ensure agents' success, and outpace its competitors in the market.

64.     As more competitors, including Navigate, enter the market, these proprietary recruiting, training, and sales strategies have become ever more critical to Mark Spain's ability to maintain its leading position.  This Confidential Information is, in essence, Mark Spain's "secret sauce"—the key to maintaining its competitive advantage and from which it derives substantial commercial value.

65.     Recognizing the economic value that Mark Spain derives from this Confidential Information, as well as the competitive nature of the market, Mark Spain employs a variety of methods to protect its Confidential Information.  These measures include, but are not limited to:

- Requiring Mark Spain leadership team members to execute a Leadership Team Confidentiality Agreement and Agreement Not to Compete identical or substantially similar to Ms. Cooper's Agreement;

- The Agreements' Confidentiality and Trade Secret Provisions;

- Quarterly verbal reminders by Mark Spain leadership that Mark Spain's Confidential Information is confidential, proprietary, and not to be shared;

- A Confidentiality Policy in Mark Spain's employee handbook (excerpts of which are attached as **Exhibit 2)**, which Mark Spain provides to all new employees and agents and makes available on its internal networks, requiring "that all information considered confidential will not be disclosed to external parties or to employees without a 'need to know,'" (Ex. 2, at 17);

- Password protection for all systems, including password requirements to access Mark Spain email accounts, Salesforce, and training materials;

- Siloed levels of access, allowing individual agents to access only their own business;

13

- Marking certain highly proprietary documents as "Confidential & Proprietary" at the bottom of each page, with a warning against sharing or distributing those materials; and

- Key card and physical access restrictions to protect hard-copy documents.

66. These policies apply to every applicable Mark Spain employee to ensure the continued confidentiality of Mark Spain's materials.

**IV.    Ms. Cooper temporarily departs from Mark Spain.**

67. In February 2023, Ms. Cooper took a brief hiatus from her employment with Mark Spain to move from Chattanooga to Nashville. This departure was not a permanent termination of her employment. Indeed, she returned only two months later—in April 2023.

68. When Ms. Cooper returned, she continued to work for Mark Spain as a Director of Sales in Tennessee, albeit in a different market. In doing so, Ms. Cooper continued to render the same leadership services that she rendered during the initial term of her employment. She even kept the same work email address.

69. Upon her return, Ms. Cooper and Mark Spain agreed that she would be doing the same job, under the same non-monetary terms as those in place before her brief departure. In other words, Ms. Cooper understood that her resumed employment with Mark Spain was under the same terms as those in place before she moved.

70. Throughout Ms. Cooper's employment (both before and after her "extended vacation," as one of her team members characterized it) the parties continued to perform under the terms of their initial Agreement.

71. As a member of the leadership team, Ms. Cooper knew that signing and complying with an Agreement was a condition of employment with Mark Spain. In fact, part of her job was to ensure that new hires signed similar agreements before starting their work with Mark Spain.

14

72. Normally, Mark Spain requires former employees who worked elsewhere and then return to undergo a 60-day training program upon starting their new job with Mark Spain. New employees also cannot receive a bonus for the quarter in which they return to Mark Spain.

73. But because Ms. Cooper's return was effectively a continuation of her prior work, those rules did not apply. Mark Spain did not make her undergo the new employee training program or orientation when she resumed her duties as a Mark Spain Director of Sales. It also even paid Ms. Cooper her quarterly bonus as though she had remained on the team and never left.

74. Mark Spain and Ms. Cooper have repeatedly acknowledged the continued nature of her employment. In text messages, Ms. Cooper referred to March 2026 as her "4 year anniversary," and acknowledged receiving a "4 year anniversary gift" from Mark Spain personnel in March 2026—four years from when she originally joined Mark Spain.

75. Ms. Cooper's LinkedIn also confirms that she was employed with Mark Spain from March 2022 to March 2026.

V. **Because it cannot compete with Mark Spain legitimately, Navigate raids Mark Spain's leadership, agents, and confidential information.**

76. As part of a larger scheme over the last ten months to poach Mark Spain's leadership employees and trample Mark Spain's contractual rights, Navigate recruited Ms. Cooper to join, take Mark Spain's Confidential Information, and solicit Mark Spain employees and agents. As a result of this scheme, Navigate has converted sales, damaged Mark Spain's goodwill in the marketplace, jeopardized Mark Spain's relationships with remaining agents and partner investors, and has obtained the enormous benefit of Mark Spain's specialized training programs without any of the cost.

15

**A. Ms. Cooper accesses Mark Spain's confidential materials before her departure, then joins Navigate the next day.**

77.    In March 2026, after Ms. Cooper decided to leave but while still employed by Mark Spain, she began courting potential offers—one from Navigate, and one from another competitive firm, Bernie Gallerani.

78.    Former Mark Spain leadership employees Ryan Byerly and Ron Conner actively recruited Ms. Cooper to Navigate, in violation of their own employee non-solicit obligations and as part of Navigate's coordinated scheme to mimic Mark Spain's confidential agent management model and attack its business.

79.    On March 5, 2026, Ms. Cooper texted Mr. Byerly about her interview, "Thank you for setting it up!" Mr. Byerly responded on March 9, 2026, "I will chat with [the Navigate team] about it!  …  We have to be reunited!"

80.    Moreover, Ms. Cooper's texts also reveal that she reached out to Ron Conner for advice on the interview process, which he provided.  Both Mr. Byerly and Mr. Conner had similar agreements preventing them from competing with Mark Spain or soliciting its employees, which they violated by providing leadership services to Navigate and by recruiting Ms. Cooper there.

81.    Mark Spain sued Mr. Byerly and Mr. Conner in North Carolina on May 11, 2026, based on their recruitment of Ms. Cooper and other actions violating their agreements.

82.    Even while she was discussing potential employment with Mr. Byerly and Mr. Conner, Ms. Cooper knew that accepting either one of her offers might violate her non-competition obligations to Mark Spain.  Indeed, texts reveal that she shared her non-competition agreement with Bernie Gallerani out of concern that it would be an issue.

16

83.     On information and belief, Navigate extended an offer of employment to Ms. Cooper on or about March 13, 2026.  At the time, Ms. Cooper did not tell Mark Spain she had received this offer.

84.     On March 19, 2026, Ms. Cooper texted, "[W]e are working through my non compete and I'll probably have to talk to a lawyer tomorrow." Later that day, she added, "Need to make sure my new job is going to pay out my q1 bonus and legal expenses cus [Mark Spain] will sue me."

85.     Just a day later, Ms. Cooper reiterated, "Can't wait for [Mark Spain] to subpoena my texts for when they take me to court for my non compete."

86.     These messages confirm not only that Ms. Cooper knew of her enforceable obligations under her Agreement with Mark Spain and was preparing to disregard them, but also that she was conspiring with her prospective employers to ensure that she would be financially protected from the inevitable lawsuit.

87.     On April 6, 2026, Ms. Cooper informed Mark Spain that she was resigning.  To conceal her plans to work at Navigate, Ms. Cooper told Mark Spain that she was leaving to go to Bernie Gallerani.

88.     The next day, Ms. Cooper's supervisor at Mark Spain reminded her of her obligations in the Agreement, including her agreements to maintain confidentiality, not compete with Mark Spain for three years after her departure, and not solicit its employees for two years after her departure.  Though Ms. Cooper had apparently already consulted an employment lawyer about the enforceability of her Agreement, she did not dispute its validity.

89.     Moreover, Ms. Cooper had no intention of complying with those obligations.  In addition to her plans to violate her non-compete, Ms. Cooper spent her last few weeks of employment gathering Mark Spain Confidential Information to use on Navigate's behalf.

90.     Specifically, unknown to Mark Spain at the time, Ms. Cooper was accessing, downloading, and printing exactly the Confidential Information a junior competitor like Navigate would need to usurp Mark Spain's market position.  In the weeks leading up to Ms. Cooper's departure—and after she had already received offers from Mark Spain's competitors—she accessed hundreds of files containing Mark Spain's Confidential Information without any legitimate business purpose.

91.     Google logs reflect that the downloaded files included:

- "2026 KPI Tracker – Sales," a spreadsheet containing week-over-week performance results and strategies for Mark Spain in 2026 both nationally and by office, which Ms. Cooper downloaded on March 25;

- "WTB Manual with Digital Signature Training – 2026," a manual containing Mark Spain's signature "Win the Business" materials (and marked "Confidential & Proprietary" on every page), a 40-hour training with step-by-step instructions and pointers enabling a new agent to learn Mark Spain's sales processes, which Ms. Cooper downloaded and printed on March 30;

- "5 Step Process Certification Scorecard," a checklist outlining the certification process that every new Mark Spain agent must pass, containing links to numerous coaching resources— also marked "Confidential & Proprietary"—which Ms. Cooper downloaded on April 6; and

18

- "ListingOfferLetter2025," a template offer letter outlining the key terms of employment for a potential agent, including commission and bonus structure, which Ms. Cooper downloaded on April 2 and printed on April 8.

92.     Even more troubling, forensic evidence reflects that, while she was working for Mark Spain, Ms. Cooper used an Apple ID on her Mark Spain laptop as well as what appear to be a personal iPhone and laptop. By default, certain data types and locations on a computer (including downloads) are "synced" to Apple ID cloud storage. This means that even after Mark Spain cut off her network access, she could still access any Mark Spain documents and files that were synced to her personal laptop when she left Mark Spain, including each of the documents above that she downloaded. The information in these documents is not publicly known or readily available in the industry, and Mark Spain gains a significant market advantage from keeping the information in these documents confidential. Mark Spain uses these documents to develop and improve its sales processes throughout Mark Spain's and its affiliates' business footprint, including in both Tennessee and North Carolina.

93.     Moreover, although Ms. Cooper's Mark Spain computer reflects some use during her last few weeks of work, Google logs show several downloads that do not appear on that device. Given that there is no concurrent activity on the Mark Spain computer, and Google logs show at least three Apple devices accessing the Mark Spain Google Suite under Ms. Cooper's user profile, it is likely that she was accessing and downloading Mark Spain Confidential Information on a personal phone or computer that is still in her possession. For instance, forensic evidence suggests that Ms. Cooper downloaded the 2026 KPI Tracker (mentioned above) on a personal phone.

19

94. On information and belief, the only reason for Ms. Cooper to download and print these materials was to prepare to use them in her employment at Navigate to unfairly compete with Mark Spain.

95. Ms. Cooper initially told Mark Spain her last day would be April 20. However, on April 13, 2026, she informed Mark Spain that it would be her last day.

96. That same day, she forwarded several emails from her Mark Spain email to her personal email account that contained confidential Mark Spain information. Among other things, these emails included: (1) information about Mark Spain's financial performance to goal, by office, for the first two quarters of 2025; (2) a link to Mark Spain's proprietary sales leadership training (likely accessible from her personal laptop because it had been synced); (3) guidance from Mark Spain's sales leadership about how regional leaders like Cooper should be improving and implementing Mark Spain's training programs; (4) coaching plans and specific benchmarks for agents identified as "high potential"; and (5) contact information for a consultant and discussions about how Mark Spain planned to partner with that consultant to improve efficiencies in its Salesforce platform. Ms. Cooper had no legitimate business reason to email these documents to herself immediately before walking out the door—the only possible reason for this activity is that she intended to use this information on Navigate's behalf.

97. The very next day, on April 14, Ms. Cooper updated her LinkedIn to reflect her employment as Vice President of Sales and Recruiting at Navigate. This job includes leadership responsibilities substantially similar to those she performed at Mark Spain.

98. As noted above, Ms. Cooper intentionally misled Mark Spain by misrepresenting her future plans upon departing from the company, stating that she would work at Bernie Gallerani instead of Navigate.

20

99. In addition to competing with Mark Spain in violation of her Agreement, Ms. Cooper has begun actively recruiting Mark Spain employees to join her at Navigate.

100. Specifically, Ms. Cooper targets Mark Spain agents directly with Navigate advertisements through Zillow.

101. Through these tactics, Ms. Cooper has already successfully recruited multiple Mark Spain agents. She sent at least one Mark Spain agent, Kimberly Scalf, an offer letter from Navigate. Ms. Cooper even signed that offer letter on behalf of Navigate, and Ms. Scalf is now a Navigate employee. And in the last few weeks alone, *four* other Mark Spain agents—Kristin Darden, Michael Yoon, Mallie Hooven, and Austin Caron—have left Mark Spain for Navigate because of Ms. Cooper's recruiting efforts.

**VI.      Mark Spain provides notice of breach to Ms. Cooper and Navigate, to no avail.**

102. After Ms. Cooper's departure, Mark Spain began to realize the full extent of Navigate's scheme and the breaches of its former leadership employees, including Ms. Cooper. When Mark Spain learned of these breaches and Navigate's tortious interference with its contractual rights after Ms. Cooper's departure, Mark Spain acted quickly and decisively.

103. In an effort to avoid litigation, on April 22, 2026, Mark Spain's outside counsel sent a formal cease-and-desist letters to Ms. Cooper and three other leadership team members poached by Navigate demanding that they, without limitation: (1) immediately resign from employment with Navigate; (2) cease solicitation of Mark Spain's current employees; and (3) return and stop using Mark Spain's Trade Secrets. A true and accurate copy of the letter sent to Ms. Cooper is attached as **Exhibit 3**.

21

104. Also on April 22, 2026, Mark Spain's counsel delivered to Navigate[1] a cease-and-desist letter demanding that Navigate: (1) instruct Ms. Cooper and the other breaching former employees to resign or face immediate termination; (2) preserve all documents and electronically stored information connected with its hiring of Ms. Cooper and the other breaching former employees; (3) prohibit all other former Mark Spain employees and agents working for Navigate from soliciting Mark Spain employees or agents to work for Navigate and/or inducing such agents or employees to end their relationships with Mark Spain; and (4) give an independent IT professional immediate access to Ms. Cooper's and the other breaching former employees' Navigate-owned equipment to determine if any of them accessed, used, disclosed, or transferred Mark Spain Confidential Information and to facilitate the return of such information. The letter to Navigate also included copies of all cease-and-desist letters and attachments sent to Ms. Cooper and the other breaching former employees. A true and accurate copy of this letter is attached as **Exhibit 4**.

105. All of these final demand letters called for confirmation of receipt and intent to comply no later than Monday, April 27, 2026.

106. As of the date of this filing, neither Navigate nor Ms. Cooper has indicated any intent to comply with Mark Spain's demands. Ms. Cooper has not so much as acknowledged Mark Spain's letter.

107. On the contrary, as discussed above, Ms. Cooper has continued actively recruiting Mark Spain employees in violation of her Agreement.

---

[1] Mark Spain's counsel also notified Navigate at least twice in March 2026 that the three leadership employees it had hired in North Carolina were breaching non-competition, non-solicit, and confidentiality provisions in substantially similar agreements to Ms. Cooper's Agreement. Navigate never responded to Mark Spain's earlier communications.

22

108. Mark Spain now finds itself without recourse outside of judicial intervention.

**VII. Defendants' actions have irreparably harmed Mark Spain.**

109. Defendants' actions have caused, and continue to cause, irreparable harm to Mark Spain. In fact, as noted above, Ms. Cooper expressly acknowledged in the Agreement that breach of her restrictive covenants would irreparably harm Mark Spain. (Ex. 1, at 4.)

110. Investor and partner relationships are critical to Mark Spain's business model. Ms. Cooper knows Mark Spain's investors well, and she inevitably has already used or will use her knowledge of investor history and preferences to solicit those investors to do business with Navigate instead. This damage is extremely difficult for Mark Spain to quantify, because investors are unlikely to disclose to Mark Spain when they are working with other firms.

111. Moreover, through the coordinated poaching efforts described above, at least four leadership employees and 11 Mark Spain agents have left their employment to join Navigate. The cost of recruiting and training new employees and agents to a similar level of skill and experience is impossible to quantify.

112. Despite the non-solicit obligations in Mark Spain's employee and agent agreements, Navigate and Ms. Cooper continue to flout those obligations and approach Mark Spain agents. Defendants' ongoing conduct confirms that nothing short of a Court order will be sufficient to make Defendants honor Mark Spain's contracts with its employees and agents.

113. While the raid on Mark Spain's workforce remains ongoing, the agents lost thus far account for more than $18,000,000 in annual sales volume lost by Mark Spain. But the harm to Mark Spain goes far beyond these lost sales. In the real estate industry, client relationships are critical, and business often comes through referrals. Thus, a lost client does not mean just one lost sale—Mark Spain has also lost potential referral business, which is much more difficult to

23

quantify. This assault on Mark Spain has damaged its reputation and goodwill and weakened employee and agent morale.

114. Ms. Cooper's retention, use, and disclosure of Mark Spain's Confidential Information further compound the irreparable harm to Mark Spain. Money damages cannot undo the harm caused by misuse and disclosure of confidential information and trade secrets.

<u>COUNT I: BREACH OF CONTRACT</u>
(Against Ms. Cooper)

115. Mark Spain incorporates the preceding paragraphs by reference as if set forth fully herein.

116. The Agreement between Mark Spain and Ms. Cooper is a valid and enforceable contract which prohibits Ms. Cooper from, without limitation: (1) participating in Leadership Team Member Services with a Competitive Business within the restricted Territory for a period of three years; (2) soliciting, diverting, or recruiting or assisting in the solicitation, diversion, or recruitment of any employee, contractor, or agent of Mark Spain to leave such employment; and (3) using, copying, duplicating, transferring, transmitting, disclosing, or permitting any unauthorized person access to any Mark Spain's Confidential Information.

117. The Post-Employment Non-Compete Provision and the Non-Solicitation Provision began to run when Ms. Cooper left Mark Spain on April 13, 2026.

118. Ms. Cooper has breached the Post-Employment Non-Compete Provision of her Agreement by engaging in Leadership Team Member Services with Navigate in the restricted Territory less than three years after the termination of her employment with Mark Spain.

119. Ms. Cooper has breached the Non-Solicitation Provision of the Agreement by recruiting or otherwise assisting in the recruitment and solicitation of Mark Spain employees and agents, enticing them to terminate their employment with Mark Spain to join Navigate.

24

120. Ms. Cooper has breached the Confidentiality and Trade Secrets Provisions of her Agreement by wrongfully using her personal computer and/or other personal devices to access, take, and retain Mark Spain's Confidential Information after the termination of her employment with Mark Spain—and she continues to have access to those materials to this day.

121. Ms. Cooper further breached the Confidentiality and Trade Secret Provisions when she downloaded files containing Confidential Information for use after termination of her employment with Mark Spain.

122. The Agreement is reasonable and necessary to protect Mark Spain's legitimate business interests, including its need to protect its goodwill, reputation, and time-invested training methodology, recruiting methodology, and business relationships with clients, investors, and employees.

123. The Agreement is not an unlawful restraint on trade or intended to prevent Ms. Cooper from participating in the marketplace. Rather, it is narrowly tailored to protect Mark Spain's legitimate business interests. The time and territorial limits on the Non-Compete and Non-Solicitation Provisions are no greater than necessary to protect Mark Spain's Legitimate Business Interests.

124. The restrictive covenants in the Agreement are aligned with the public's interest in companies developing and protecting specialized data and information to better serve their clients, recruiting and developing a strong workforce, and protecting the fruits of their investment to create a competitive market.

125. As a direct and proximate result of Ms. Cooper's breaches of the Agreement, Mark Spain has suffered damages and will continue to suffer damages, including lost revenues and

25

profits, lost productivity, and expenses associated with Mark Spain's efforts to mitigate the damage or threatened damage by Ms. Cooper.

126. Absent injunctive relief, Ms. Cooper will continue to violate her contractual obligations, and Mark Spain will continue to suffer undue and irreparable harm.

<u>**COUNT II: MISAPPROPRIATION OF TRADE SECRETS**</u>
<u>**DEFEND TRADE SECRETS ACT OF 2016**</u>
**(Against Ms. Cooper)**

127. Mark Spain incorporates the preceding paragraphs by reference as if set forth fully herein.

128. Mark Spain possesses and uses highly valuable, unique Confidential Information including, but not limited to: (1) agent training materials; (2) sales performance and financial data; (3) investment habits and preferences of investors with whom Mark Spain does or has done business, which was accumulated, analyzed, developed, and utilized over time and various transactions with the investors; (4) Mark Spain's specialized process for recruiting and selecting sales agents; and (5) confidential details pertaining to each appointment taken by a Mark Spain sales agent and each closing performed by Mark Spain. This Confidential Information includes the documents that Ms. Cooper downloaded without business justification and to which she retains access on her personal devices, as described in paragraphs 90 and 91 above.

129. This Confidential Information is confidential, proprietary, not generally known to the public, and constitutes trade secrets within the meaning of the Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. § 1839.

130. Mark Spain uses this Confidential Information in interstate commerce. Mark Spain relies heavily on this Confidential Information to work with customers, identify potential customers, identify interested investors, work with investors, train employees, and monitor

26

employee performance across the South, including Tennessee. In particular, the training materials misappropriated by Cooper are used to train Mark Spain agents across all of its offices—most of which are located outside Tennessee. Likewise, Cooper misappropriated sales data and hiring goals for each of Mark Spain's offices.

131. Mark Spain derives, both directly and indirectly, independent economic value from this Confidential Information because it is not generally known to the public or interested parties, nor is it readily ascertainable by proper means by persons other than Mark Spain who could obtain economic value from their disclosure.

132. Mark Spain incurred substantial expense and spent many years compiling and refining its Confidential Information.

133. Ms. Cooper has wrongfully taken and retained Mark Spain's Confidential Information and trade secrets during and following her employment with Mark Spain.

134. Specifically, Ms. Cooper used personal devices and her Mark Spain credentials to access and take Confidential Information for use after her employment with Mark Spain. And, she continues to have access to any of Mark Spain's Confidential Information that was "synced" to her personal devices, including, on information and belief, the information described in paragraphs 90 and 91 above.

135. This information includes, but is not limited to, various templates that Mark Spain uses as part of its industry-leading process, information about Mark Spain's financial performance to goal across its offices throughout the Southeast in 2025 and 2026, proprietary sales leadership training, proprietary agent coaching plans, sample agent offer letters, and numerous other materials that would enable Navigate's newly formed Nashville office to compete with Mark Spain.

27

136.    Moreover, even if Ms. Cooper has not already disclosed Mark Spain's Confidential Information, Ms. Cooper will inevitably use and disclose that information in the course of her employment with Navigate. Ms. Cooper works in a substantially similar role at Navigate, and the Confidential Information she took would help her perform in that role. If not to use in her new employment, Ms. Cooper would have no reason to take Mark Spain's Confidential Information.

137.    Ms. Cooper owed, and continues to owe, a duty to maintain the secrecy of the Confidential Information. Ms. Cooper knew or had reason to know, and continues to know or have reason to know, of that duty at the time she retained the Confidential Information without Mark Spain's consent.

138.    As a direct and proximate result of Ms. Cooper's violations of the Defend Trade Secrets Act, Mark Spain has sustained substantial damages in an amount that will be established at trial.

139.    Mark Spain has suffered and will continue to suffer irreparable harm due to Ms. Cooper's unlawful conduct. Her conduct has resulted and will likely continue to result in a substantial loss of business, agent and investor relationships, and market share for Mark Spain.

140.    The actions of Ms. Cooper were willful, malicious, and intended to injure Mark Spain and its business.

141.    Mark Spain has no adequate remedy at law because Ms. Cooper's actions are affecting Mark Spain's goodwill, reputation, and ability to compete in a highly competitive marketplace.

28

## COUNT III: MISAPPROPRIATION OF TRADE SECRETS
## TENNESSEE UNIFORM TRADE SECRETS ACT
### (Against Ms. Cooper)

142.    Mark Spain incorporates the preceding paragraphs by reference as if set forth fully herein.

143.    Mark Spain possesses and uses highly valuable, unique Confidential Information including, but not limited to: (1) agent training materials; (2) sales performance and financial data; (3) investment habits and preferences of investors with whom Mark Spain does or has done business, which was accumulated, analyzed, developed, and utilized over time and various transactions with the investors; (4) Mark Spain's specialized process for recruiting and selecting sales agents; and (5) confidential details pertaining to each appointment taken by a Mark Spain sales agent and each closing performed by Mark Spain. This Confidential Information includes the documents that Ms. Cooper downloaded without business justification and to which she retains access on her personal devices, as described in paragraphs 90 and 91 above.

144.    This Confidential Information includes technical, nontechnical, and financial data, as well as formulas, patterns, compilations, programs, methods, techniques, processes, and plans within the meaning of the Tennessee Uniform Trade Secrets Act ("TUTSA"), as trade secrets are defined in Tenn. Code § 47-25-1702.

145.    Mark Spain derives both actual and potential independent economic value from this information not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use.

146.    Mark Spain allocates resources and efforts reasonable under the circumstances to maintain the secrecy of this information.

29

147. Ms. Cooper has wrongfully taken and retained Mark Spain's Confidential Information and trade secrets during and following her employment with Mark Spain. On information and belief, she did so to use and/or disclose that information in her employment at Navigate.

148. In the final days of her employment with Mark Spain, when she had already agreed to join Navigate, Ms. Cooper improperly used her access to Mark Spain's Confidential Information and trade secrets to acquire Mark Spain's trade secrets for use as a Navigate employee.

149. Specifically, Ms. Cooper used personal devices and her Mark Spain credentials to access and take Confidential Information for use after her employment with Mark Spain. And, she continues to have access to any of Mark Spain's Confidential Information that was "synced" to her personal devices, including, on information and belief, the information described in paragraphs 90 and 91 above.

150. This includes, but is not limited to, various templates that Mark Spain uses as part of its industry-leading process, information about Mark Spain's financial performance to goal across its offices throughout the Southeast in 2025 and 2026, proprietary sales leadership training, proprietary agent coaching plans, sample agent offer letters, and numerous other materials that would enable Navigate's newly formed Nashville office to compete with Mark Spain.

151. Moreover, even if Ms. Cooper has not already disclosed Mark Spain's Confidential Information, Ms. Cooper will inevitably use and disclose that information in the course of her employment with Navigate. Ms. Cooper works in a substantially similar role at Navigate, and the Confidential Information she took would help her perform in that role. If not to use in her new employment, Ms. Cooper would have no reason to take Mark Spain's Confidential Information.

30

152. Ms. Cooper knew or had reason to know that acquiring the trade secrets in this manner was and continues to be improper.

153. At the various times Ms. Cooper has used or disclosed this trade secret information, she knew or had reason to know that she had derived it through improper means, initially acquired under circumstances detailed in her Agreement giving rise to a duty to maintain its secrecy or limit its use, and that she, in fact, owed a duty to Mark Spain to maintain the secrecy and limit the use of that information.

154. Ms. Cooper has retained unpermitted access to Mark Spain's trade secrets for the purpose of helping Navigate compete unfairly in the marketplace.

155. Ms. Cooper owed, and continues to owe, a duty to maintain the secrecy of the Confidential Information. She was aware or had reason to be aware of that duty at the time she retained the Confidential Information without Mark Spain's consent.

156. As a direct and proximate result of Ms. Cooper's violations of the TUTSA, Mark Spain has sustained substantial damages in an amount that will be established at trial.

157. Mark Spain has and will continue to suffer irreparable harm due to Ms. Cooper's unlawful conduct and the disclosure and misappropriation of Mark Spain's Confidential Information and trade secrets. Her conduct has and will likely continue to result in a substantial loss of business, agent and investor relationships, and market share for Mark Spain, now and in the future.

158. Ms. Cooper's actions were willful, malicious, and intended to injure Mark Spain and its business.

31

159.    Mark Spain has no adequate remedy at law because Ms. Cooper's actions are affecting Mark Spain's goodwill, reputation, and ability to compete in the highly competitive marketplace such that monetary damages are insufficient.

### COUNT IV: INDUCEMENT OF BREACH OF CONTRACT
**(Against Navigate)**

160.    Mark Spain incorporates the preceding paragraphs by reference as if set forth fully herein.

161.    The Agreement is a valid and binding contract.

162.    Navigate should have known of the Agreement when it was recruiting Ms. Cooper in mid-March, as it had already recruited several Mark Spain leadership employees holding similar roles to Ms. Cooper that were bound by similar agreements.  At the very latest, Navigate knew of the Agreement by April 24, 2026, when Navigate's counsel confirmed receipt of the cease-and-desist letter sent to Navigate.

163.    Navigate, knowing of Ms. Cooper's obligations under the Agreement, intended to and did, in fact, induce Ms. Cooper to breach the Agreement.

164.    Navigate's actions were malicious, willfully in violation of known rights afforded to Mark Spain under the Agreement, and intended to gain an unfair competitive advantage in the marketplace.

165.    By providing leadership services to Navigate, soliciting Mark Spain agents, and misappropriating Mark Spain's confidential and trade secret information for use on Navigate's behalf, Ms. Cooper breached the Agreement.

166.    Navigate's actions directly and proximately caused Ms. Cooper to breach the Agreement.

32

167. Navigate's conduct has caused and will continue to cause actual damages in an amount to be determined at trial, including, but not limited to, the loss of customers, agents, goodwill, future referrals, exclusive possession of its Confidential Information, and the costs and fees associated with enforcing Mark Spain's rights under the binding Agreement.

## COUNT V: BREACH OF FIDUCIARY DUTY/BREACH OF DUTY OF LOYALTY
### (Against Ms. Cooper)

168. Mark Spain incorporates the preceding paragraphs by reference as if set forth fully herein.

169. As a Mark Spain employee in Tennessee, Ms. Cooper owed a fiduciary duty of loyalty to Mark Spain. Accordingly, Ms. Cooper was duty-bound to act solely for the benefit of Mark Spain in matters related to her employment and not to engage in conduct adverse to Mark Spain's interests.

170. Ms. Cooper's actions on behalf of Navigate, while still employed by Mark Spain, were directly adverse to Mark Spain's proprietary and business interests.

171. Ms. Cooper was in a position of substantial trust, confidence, and control over various Mark Spain operations, including the recruitment, training, and retention of dozens of agents.

172. Ms. Cooper was entrusted with access to significant and sensitive Mark Spain Confidential Information by virtue of her role with Mark Spain and control over its operations.

173. She exercised substantial authority and influence over Mark Spain's recruitment, training, and retention strategies. She performed her leadership role with significant discretion.

174. Ms. Cooper's substantial control over these important facets of Mark Spain's business give rise to fiduciary duties, including the fiduciary duty of loyalty to Mark Spain.

175. Separately, the Agreement dictates that Ms. Cooper "acknowledge[d] and agree[d] that [she] has undertaken a fiduciary duty to [Mark Spain] as a member of the leadership team for [Mark Spain]." (Ex. 1, at 6.)

176. Despite this duty, Ms. Cooper wrongfully took possession of Mark Spain's Confidential Information and property for use in eventual employment with Mark Spain's competitor, Navigate. This conduct constituted breach of her fiduciary duty owed to Mark Spain.

177. Ms. Cooper's actions have directly and proximately caused, and continue to cause, harm to Mark Spain in an amount to be proven at trial.

<u>**COUNT VI: CONVERSION**</u>
**(Against Ms. Cooper)**

178. Mark Spain incorporates the preceding paragraphs by reference as if set forth fully herein.

179. Ms. Cooper is in wrongful possession of Mark Spain's Confidential Information.

180. The Confidential Information is Mark Spain's property.

181. Ms. Cooper has appropriated Mark Spain's Confidential Information in defiance of Mark Spain's ownership rights for her own use and benefit.

182. Ms. Cooper's actions in exercising dominion over the Confidential Information were intentional.

183. Though stored electronically, the information and materials appropriated by Ms. Cooper are tangible property.

184. Mark Spain has demanded return of its property, and Ms. Cooper has refused to comply with these demands.

185. As a direct and proximate result of Ms. Cooper's conversion of its property Mark Spain has suffered and will continue to suffer damages and irreparable harm.

34

186.     Mark Spain has no adequate remedy at law because Ms. Cooper's actions are affecting its goodwill, reputation, and ability to compete in a highly competitive marketplace.

187.     By converting Mark Spain's property for her own benefit and the benefit of a direct Mark Spain competitor, Ms. Cooper acted with malice, wantonness, bad faith, conscious disregard for Mark Spain's rights, and with the specific intent to cause harm to Mark Spain.  Accordingly, Mark Spain is entitled to punitive damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Mark Spain prays for the following relief:

1. That Mark Spain have and recover compensatory and punitive damages from each Defendant in an amount to be proven at trial, plus pre-judgment and post-judgment interest;

2. That the Court enter an Order temporarily and permanently enjoining Defendants as follows:

   a. Requiring Ms. Cooper to stop performing Leadership Team Member Services, as defined in her Agreement, within the temporal and territorial limitations set out in that Agreement, including, without limitation, by requiring Ms. Cooper to stop working in her current role at Navigate;

   b. Requiring Ms. Cooper to cease and desist all interference with the contracts or business or economic relationships of Mark Spain by soliciting or otherwise encouraging, directly or indirectly, Mark Spain employees and agents to leave Mark Spain;

   c. Requiring Defendants to cease and desist from accessing, using, or disclosing any Mark Spain confidential information or trade secrets;

d. Requiring Ms. Cooper to preserve any and all information currently stored on any personal devices and/or accounts that contain or previously contained or have been used to access Mark Spain information or trade secrets, including, without limitation, her personal iPhone and laptop, and produce the same to an independent computer forensics expert to conduct an appropriate search;

e. Requiring Ms. Cooper to return to Mark Spain all originals, copies, and reproductions, in all forms, of any Mark Spain confidential information or trade secrets;

f. Requiring Navigate to sequester, cease using, and make available for third-party forensic inspection all devices and accounts that contain, previously contained, and/or have been used to access Mark Spain confidential information or trade secrets;

g. Requiring Navigate to stop inducing breach of Mark Spain's contractual relationship with Ms. Cooper and its agents, to stop aiding and abetting Ms. Cooper's breaches of her Agreement, and to stop employing Ms. Cooper in any capacity that involves the provision of Leadership Team Member Services;

h. Requiring Ms. Cooper to cease and desist any ongoing violation(s) of her Agreement.

3. That Mark Spain be awarded its interest, costs, and expenses, including attorneys' fees, to the extent permitted by law;

4. That Mark Spain be awarded punitive damages for Defendants' wanton, willful, and malicious conduct;

5. That the Court allow Mark Spain a jury trial on all triable issues; and

36

6. That the Court award Mark Spain such additional relief as the Court deems just and proper.

Respectfully submitted this 26th day of May, 2026.

BULSO PLC

/s/ Paul J. Krog
Paul J. Krog (No. 29263)
155 Franklin Road, Suite 400
Brentwood, TN 37027
(615) 913-5130
pkrog@bulso.com

MCGUIREWOODS LLP

Daniel P. Bubar (*pro hac vice forthcoming*)
501 Fayetteville Street, Suite 500
Raleigh, NC 27609
(919) 755-6616
(919) 836-4026 (facsimile)
dbubar@mcguirewoods.com

Heidi E. Siegmund (*pro hac vice forthcoming*)
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
(804) 775-1049
(804) 698-2315 (facsimile)
hsiegmund@mcguirewoods.com

Nathan Pinnell (*pro hac vice forthcoming*)
888 16th Street NW, Suite 500
Washington, DC 20006
(202) 857-2441
(202) 828-3341 (facsimile)
npinnell@mcguirewoods.com

*Counsel for Plaintiff*

## VERIFICATION

I declare under penalty of perjury that the factual allegations in the Verified Complaint are true and correct, except those made on information and belief, and as to those, I reasonably believe them to be true based on the information presently available to me.

Executed this 26th day of May, 2026.

Dan Rohde
Mark Spain
Chief Operating Officer

## INDEX OF EXHIBITS TO THE COMPLAINT

| Exhibit | Description |
|---|---|
| Exhibit 1 | Jan Cooper Leadership Agreement |
| Exhibit 2 | Excerpts of Employee Handbook |
| Exhibit 3 | April 22, 2026 Cease-and-Desist Letter to Jan Cooper |
| Exhibit 4 | April 22, 2026 Cease-and-Desist Letter to Navigate Realty, LLC |