IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| VERIS HOME TECHNOLOGY LLC D/B/A AXISS AUDIO )<br><br>Plaintiff, )<br><br>v. )<br><br>MICHAEL BOVAIRD, MICHAEL GEFTEAS, FLORIAN WIEGAND, SUNCOAST AUDIO LLC, LUXURY HI-FI DISTRIBUTION LLC, CLARISYS AUDIO GLOBAL DISTRIBUTION, LLC, and BESPOKE AUDIO SHOP, )<br><br>Defendants. | **COMPLAINT**<br><br>Case No. _____<br><br>**JURY DEMAND** |

**COMPLAINT**

Plaintiff, by and through its attorneys, brings this Complaint against the above-named Defendants, and state the following in support thereof:

**INTRODUCTION**

1. Plaintiff Veris Home Technology LLC ("Veris") is the holding company of AXISS Audio USA, LLC and AXISS Distribution Incorporated ("ADI"). Together Veris and its two subsidiary companies do business as AXISS Audio ("AXISS"). AXISS is one of the largest importers and distributors of high-end audio Hi-Fi equipment in the United States.

2. AXISS is the exclusive importer and distributor of more than fifteen high-end audio Hi-Fi brands including Accuphase, Soulution, Gauder Akustik, Franco Serblin, and more.

1

3. Since 2023, when new ownership took over and made meaningful investments of time and capital, AXISS has made substantial operations improvements which have resulted in sales growth of over 300% on average for each of the AXISS brands.

4. Among AXISS's brands is Soulution Audio ("Soulution"). The Absolute Sound ("TAS," the largest high end Hi-Fi media company) has awarded more Product of the Year awards to Soulution since its launch in 2006 than to any other high-end Hi-Fi electronics brand. In 2026, as explained in more detail below, Soulution's 717 power amplifier received numerous awards and extraordinary accolades that should have led to significant sales for AXISS.

5. But Defendants' actions, including multiple breaches of contract, numerous instances of defamation and slander, and repeated instances of intentional interference with AXISS's contracts and business relationships derailed AXISS's sales and tarnished Soulution's reputation in the high-end Hi-Fi industry.

6. Defendant Suncoast Audio LLC ("Suncoast"), which is owned by Defendant Michael Bovaird ("Bovaird"), severely mishandled a sale of Soulution products to a prominent customer in breach of its contractual obligations to AXISS. Then, rather than owning up to its mistake, Suncoast and Bovaird blamed AXISS and sought to put the cost of their mistakes on AXISS through a series of false and damaging stories, all of which was in further breach of Suncoast's contract with AXISS.

7. On information and belief, Defendants Bovaird, Suncoast, Luxury Hi-Fi Distribution LLC ("Luxury"), and Clarisys Audio Global Distribution, LLC ("Clarisys", and together with Bovaird, Suncoast, and Luxury the "Bovaird Defendants") have been compensating Defendant Michael Gefteas ("Gefteas")—a professional promoter and reviewer of Hi-Fi products who operates as "The Greek Audio Geek" on Facebook and Youtube—for product reviews.

2

8. Gefteas operates the Bespoke Audio Shop ("Bespoke", and together with Gefteas the "Gefteas Defendants"), a consulting service that connects purchasers of audio equipment to dealers. On information and belief, the Gefteas Defendants conspired with the Bovaird Defendants to take the actions alleged in this lawsuit to benefit themselves through illegal means at the expense of AXISS.

9. Gefteas has repeatedly published false and damaging stories about AXISS and Soulution and has shared confidential information he could have learned only from the Bovaird Defendants. On information and belief, Gefteas has been compensated by the Bovaird Defendants to publish false and damaging stories.

10. Gefteas has been highly critical of AXISS and Soulution and laudatory to Suncoast, Luxury, and Clarisys. Clarisys is owned by Defendants Bovaird and Wiegand and is a manufacturer of high-end Hi-Fi audio speakers that competes with speakers brands that AXISS distributes. On information and belief, Gefteas has been compensated by the Bovaird Defendants to publish positive reviews of Hi-Fi products sold by Suncoast and imported and distributed by Luxury, including Clarisys which is owned by Bovaird and Wiegand.

11. Bovaird owns Suncoast, Luxury, and Clarisys and engaged in defamation and slander against AXISS—and conspired with Gefteas for him to defame AXISS—in order to intentionally interfere with AXISS's relationship with Soulution so as to destroy AXISS as a competitor and tarnish the reputation of Soulution as a preferred high-end Hi-Fi brand in the industry.

12. Wiegand owns Clarisys with Bovaird and likewise engaged in defamation and slander against AXISS—and conspired with Gefteas for him to defame AXISS—in order to intentionally interfere with AXISS's relationship with its brands, such as Soulution and Gauder

3

Akustik, so as to destroy AXISS as a competitor, damage the reputation of its products, and tarnish Soulution as a preferred Hi-Fi brand in the industry.

13. The contract breaches, defamation, slander, and intentional interference with AXISS's business and contract relationships by the Bovaird Defendants and Gefteas Defendants are part of a civil conspiracy among all Defendants to harm AXISS and benefit all of the Defendants.

14. Defendants via their actions and conspiracy have caused millions of dollars of economic harm and immense reputational harm to AXISS.

15. Plaintiff seeks monetary damages to compensate for its losses as well as judgment from this Court to restore its reputation after the many falsehoods Defendants have intentionally injected into the high-end Hi-Fi market.

## JURISDICTION AND VENUE

16. This is an action between citizens of different states where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs. This Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1332. Veris is a Tennessee limited liability company with its principal place of business in this district. All of Veris's members are citizens of Tennessee. Defendants Suncoast, Luxury, and Clarisys are Florida limited liability companies with their principal place of business in Florida, and on information and belief no members of Suncoast, Luxury, or Clarisys are citizens of Tennessee; Defendant Bovaird is a Florida citizen; Defendant Wiegand is a Swiss citizen who, on information and belief, resides at times in Florida; Defendant Gefteas is a Texas citizen; and Defendant Bespoke is a Texas sole proprietorship under which Gefteas does business.

4

17.     Venue in this district is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims in this lawsuit occurred in this district. AXISS's principal place of business is in this district. Defendant Suncoast contracted with AXISS, in this district. Defendants' torts were all directed at AXISS in this district, including their intentional interference with AXISS's business relationships.

18.     This Court has personal jurisdiction over Defendants pursuant to Tennessee's long-arm statute, Tenn. Code Ann. § 20-2-223, because Defendants transacted business in this state, caused tortious injury to Plaintiff by act or omissions in this state, and/or caused tortious injury outside of this state while regularly doing or soliciting business, engaging in other persistent courses of conduct, and/or deriving substantial revenue from goods used or consumed or services rendered in this state.

19.     An actual and justiciable controversy exists between Plaintiff and Defendants.

## THE PARTIES

20.     Plaintiff Veris Home Technology LLC d/b/a AXISS Audio ("AXISS") is a Tennessee limited liability corporation with its principal place of business in Nashville, Tennessee. Veris's members are all citizens of Tennessee. AXISS owns all stock and controls all property and rights held by AXISS Distribution, Inc., ("ADI") a California corporation, including all contract rights ADI has with Suncoast, Soulution, and other parties to this lawsuit.

21.     Defendant Michael Bovaird is an individual residing in Sarasota, Florida. Bovaird owns Defendants Suncoast and Luxury and has an ownership interest in related party Clarisys.

22.     Defendant Suncoast Audio, LLC is a Florida limited liability corporation with its principal place of business in Sarasota, Florida. On information and belief, the members of Suncoast are Florida citizens, and no member is a citizen of Tennessee.

5

23. Defendant Luxury Hi-Fi Distribution, LLC is a Florida limited liability corporation with its principal place of business in Sarasota, Florida. On information and belief, the members of Luxury are Florida citizens, and no member is a citizen of Tennessee.

24. Defendant Clarisys Audio Global Distribution, LLC is a Florida limited liability corporation with its principal place of business in Sarasota, Florida. On information and belief, the members of Clarisys are Florida citizens or citizens of Switzerland, and no member is a citizen of Tennessee.

25. Defendant Florian Wiegand is a Swiss citizen and co-owner and Manager of Clarisys.

26. Defendant Michael Gefteas is an individual residing in Frisco, Texas. Gefteas reviews and promotes high-end Hi-Fi equipment under the name The Greek Audio Geek. Gefteas owns Bespoke.

27. On information and belief, Defendant Bespoke is a Texas sole proprietorship with its principal place of business in Frisco, Texas. Gefteas does consulting work as Bespoke.

## FACTUAL ALLEGATIONS

### AXISS and Soulution Build a Successful Partnership

28. AXISS is the successor company to ADI, which was founded in 1993. Since 1993 AXISS has been an importer and distributor of top-tier Hi-Fi equipment.

29. Today, AXISS represents more than 15 top brands like Accuphase, Soulution, Gauder Akustik, Franco Serblin, and more.

30. AXISS is owned by Cliff Duffey, a passionate audiophile and successful entrepreneur who founded and led an Internet security software company for over twenty years.

6

Mr. Duffey is a small business owner based in Nashville, Tennessee who brought his years of business experience and put his own time and capital at risk to acquire and revitalize AXISS.

31.     Since the purchase in 2023, the new ownership of AXISS has made substantial operations improvements which have resulted in sales growth of over 300% on average for each of the AXISS brands.

32.     AXISS does not sell direct to consumers. It is a pure wholesale distributor to retail Dealers who are themselves specialists at installing and supporting high end Hi-Fi products for passionate audiophile customers.

33.     Many Hi-Fi distributors in the United States provide import and logistics services with some small amount of advertising and sales support for their Dealers, but AXISS goes much further by working as an outsourced extension of the manufacturers it imports and distributes. AXISS owns responsibility for all operations, marketing, product support, service, and repair for its Dealers and customers in the United States and North America.[1]  This allows AXISS's brand partners to focus solely on their technology and manufacturing while outsourcing everything else to AXISS, and the comprehensive outsourcing approach has been a key differentiator and a driving reason behind the success of AXISS's stellar reputation in the industry and coinciding sales growth.

34.     Today AXISS is one of the largest high-end Hi-Fi importers and distributors in the United States. Its sales growth has exceeded 300% since 2023. Before the events giving rise to this lawsuit, AXISS was seeing uninterrupted sales growth. Prior to the actions of Defendants alleged in this lawsuit, Soulution was AXISS's most successful brand.

---

[1] As explained below, warranties for the products AXISS imports and distributes are provided by the manufacturers.

7

35. Soulution Audio is a subsidiary business of the Swiss company Spemot AG ("Spemot"). Since around 1960, Spemot's primary business has been to build high quality electric motors, mostly for special application purposes.

36. Starting around 2005, Spemot launched Soulution as a new subsidiary business. Spemot's goal was for Soulution to build the highest performance audio electronics possible, with cost as no object, leveraging the experience that Spemot had developed in advanced electronics engineering.

37. Today Spemot and Soulution operate from their factory office in Dulliken, Switzerland with an estimated 60 employees.

38. The results for the Soulution products have been extraordinary. Since the launch of its first products, reviewers and customers have hailed Soulution as one of the best manufacturers of high-end Hi-Fi audio electronics in the world.

39. Over the past 20 years, The Absolute Sound ("TAS"), the largest high end Hi-Fi media company, has awarded more Product of the Year awards to Soulution than any other high-end Hi-Fi electronics brand.

40. Each generation of Soulution products has been widely regarded as one of the very best in their category. For example, the Soulution 727 preamplifier was named by TAS to be the "Preamp of the Year" when it was launched in 2024. The Soulution 757 phono amplifier was named by TAS to be the "Overall Product of the Year" in 2025 after its launch.

41. As relevant here, in January 2026, the Soulution 717 power amplifier was reviewed by TAS and featured on the cover of the magazine. The TAS reviewer and Executive Editor called it the most life-like solid-state amplifier he has heard and one of the best amplifiers ever.

42.     In April 2026, AXISS's Soulution show room at the largest North America tradeshow, AXPONA, was awarded Best in Show by multiple reviewers as the best sounding room in the "cost no object" category.  In July 2026, TAS selected the Soulution 717 for its annual Golden Ear award and selected the 717 to be the Overall Best New Hi-Fi Technology of the Year.

43.     AXISS is the exclusive importer and distributor of Soulution products in the United States and the rest of North America. A true and correct copy of AXISS's contract with Spemot / Soulution is attached to this complaint as **Exhibit 1**.

44.     AXISS has invested substantial time and capital into promotion of all of its brands, including Soulution. For example, AXISS invested substantial time and capital to create its award-winning Soulution showroom at AXPONA.

45.     That investment, coupled with the many awards and accolades for the Soulution products, poised Soulution for sales, revenue, and profit growth. But all of that ended abruptly because of Defendants' bad acts.

46.     AXISS calculates that Defendants' actions have already cost AXISS more than $1,800,000.00, a damages amount that grows by the day because of the ongoing reputational harm Defendants conspired to foist upon AXISS and its brands.

**Suncoast Contracts with AXISS While Luxury Competes with AXISS**

47.     The Bovaird Defendants are competitors to AXISS who sell competing brands, including the Clarisys brand in which they have a significant financial interest.

48.     Bovaird is an entrepreneur in Florida who owns and operates a number of Hi-Fi audio businesses. These businesses include Suncoast, Luxury, and Clarisys.

49.     Luxury is an import and wholesale distribution business located in Sarasota, Florida that engages in substantially similar work to AXISS.

9

50. Luxury and AXISS compete directly against each other

    a. to win the exclusive distribution rights for high-end Hi-Fi products that want to sell in North America;

    b. to sign up top Dealers to sell the brands that each company represents; and

    c. to sell the high-end Hi-Fi brands and products, via dealers, to the ultimate customers.

51. Luxury is the exclusive North American distributor for Clarisys Audio speakers, and a handful of other Hi-Fi brands.

52. Clarisys manufactures and sells high end Hi-Fi speakers made with a unique ribbon-style driver.

53. Bovaird and Wiegand have a financial interest in Clarisys. They are listed as co-managers of Clarisys by the Florida Secretary of State. On information and belief, Bovaird, either directly or through companies that he owns and controls, owns a 50% interest in Clarisys, and Wiegand owns the other 50%.

54. Clarisys products have not won as many awards or accolades as Soulution products.

55. Suncoast is a retail Dealer of high-end Hi-Fi products located in Sarasota, Florida. Suncoast sells directly to consumers and represents a larger number of audio brands than Luxury.

56. Bovaird owns Suncoast.

57. Suncoast is an Authorized Dealer of AXISS that, until the early 2026, carried Soulution products as well as other products exclusively imported and distributed by AXISS.

58. To that end, Suncoast entered into an Authorized Dealer Agreement with AXISS. A true and correct copy of the Authorized Dealer Agreement (the "Agreement") is attached to this complaint as **Exhibit 2**.

59.     AXISS has entered into similar Authorized Dealer Agreements with all of its authorized dealers.

60.     The Bovaird Defendants and Gefteas Defendants are aware of AXISS's business relationships with its dealers.

61.     In the Agreement, Suncoast, among other things, agreed to adhere to specific trade practices and to make its best efforts to support any AXISS products it sells.

62.     Specifically, in section 3.6 of the Agreement, Suncoast contracted to abide by certain trade practices:

3.6     **Trade Practices.** Dealer shall at no time engage in "bait and switch" practices or any other unfair trade practices with respect to the Products, shall make no physical, electrical or mechanical alterations to the Products without the advance written consent of the Company, shall make no false or misleading representations with regard to the Company or the Products, and shall engage in no activities which may reflect adversely upon the Company or the Products. Dealer shall make no representations to customers or to the trade with respect to the specifications, features or performance of the Products, except such as may be approved in writing or published by the company.

63.     Among others, Suncoast promised not to "bait and switch" customers between products and to "make no false or misleading representations with regard to [AXISS] or the Products, and shall engage in no activities which may reflect adversely upon [AXISS] or the Products."

64.     In Section 3.7 of the Authorized Dealer Agreement Suncoast agreed to:

3.7     **Best Efforts.** Dealer shall use its best efforts to promote and sell the Products and shall at all times represent the Products fairly in comparison with competitive products. If a customer inquires about a product which is competitive with any of the Company's Products carried by Dealer, Dealer shall describe and offer to demonstrate the features and benefits of the Company's Products so as to enable the customer to enjoy a full range of choice.

11

65.     This was a material term of the Agreement. Specifically, since Suncoast not only sells but, in fact, has an owner (Bovaird) with ownership in (i.e. a conflict of interest in) Luxury (a competing importer / distributor), and an interest in Clarisys (a competing brand), it was especially important that Suncoast agreed in 3.7 to "use its best efforts to promote and sell the Products and . . . at all times represent the Products fairly in comparison with competitive products."

66.     The Bovaird Defendants all have a material interest as competitors to AXISS and Soulution in seeking the diminishment of AXISS and its exclusive brands, such as Soulution and Gauder Akustik, while perpetuating the advancement of Luxury and its exclusive brands, especially Clarisys.

67.     Given that competitive posture, Suncoast's contractual promises to make no misleading statements and engage in no activities reflecting adversely upon AXISS and its products (3.6), and to use its best efforts to represent the products fairly in comparison with other products (3.7), was especially important before AXISS would agree to do business with Suncoast.

68.     Suncoast also acknowledged in Article 8 of the Agreement that AXISS does not warrant the products it imports and resells. Suncoast specifically acknowledged that AXISS gave Suncoast no implied warranties, and Suncoast acknowledged that AXISS is not liable for any damages because of products or parts defects.

69.     Rather, warranties in the high-end Hi-Fi audio market are provided by the actual manufacturers of products. Typically a warranty requires the manufacturer to repair or replace any audio product that is damaged or does not otherwise operate as promised.

70.     While a refund is possible if a product does not work, that refund is provided by the manufacturer after a reasonable period of time to repair or replace the product.

71.     As the importer and distributor, AXISS facilitates between Dealers like Suncoast and manufacturers like Soulution the repair and replacement of products.

72.     Following Suncoast's breaches of the Agreement detailed below, especially Suncoast's material breach by conspiring with the Gefteas Defendants to defame and slander AXISS, AXISS terminated the Agreement in late December of 2025, with an effective date of January 22, 2026.

**Gefteas Demands Compensation for Favorable Reviews**

73.     At about the same time AXISS contracted with Suncoast, AXISS began to work with Gefteas to seek reviews of AXISS and its products.

74.     Michael Gefteas is a full-time professional Hi-Fi product reviewer and promoter who operates as "The Greek Audio Geek" on Facebook and YouTube.

75.     Manufacturers and distributors pay Gefteas to review and promote their products and post comments on his Facebook and YouTube channels.

76.     AXISS first worked with Gefteas in November of 2023. Gefteas reviewed AGS diffusor products imported and distributed by AXISS that were made by a company named Nihon Onkyo Engineering.  After completing the review, Gefteas contacted AXISS, told AXISS that he really liked the AGS products, and asked if AXISS would make it possible for Gefteas to find a way to keep the AGS products.

77.     Since Gefteas's review had been favorable and led to a few new sales, AXISS agreed to sell Gefteas the reviewed products for $5,916.60, which is a 62% discount to the $15,370.00 retail price Gefteas would otherwise have had to pay. AXISS and Gefteas agreed that the nearly $10,000.00 discount was fair compensation for the review and promotion of the AGS products.

13

78. As agreed, Gefteas paid the first 50% of that amount, $2,958.30, on July 5, 2024 and the remaining balance of $2,958.30 on August 27, 2024.

79. That same August of 2024, Gefteas began a new review for AXISS on an Accuphase E-5000 integrated amplifier. Gefteas published this review on both Facebook and YouTube in October 2024, and it was very positive and favorable for the Accuphase product.

80. After Gefteas completed the Accuphase review, he reached out to TJ Goldsby, an AXISS employee. Although neither AXISS nor Gefteas had discussed any compensation for Gefteas's Accuphase review, Gefteas told Goldsby that he did not think it was fair for him to not receive additional compensation because Gefteas's AGS review had led to a number of sales and he deserved to share more in that product's success. Gefteas then told Goldsby that he did not think it was fair that AXISS had required him to make the final $2,958.30 payment on the AGS products he purchased. Gefteas proposed that AXISS should consider refunding that payment as compensation for the Accuphase E-5000 review and as a thank you for the success of the AGS review.

81. Goldsby agreed to discuss the idea with the AXISS management team and share feedback at a later date, but before Goldsby could finish that consultation, Gefteas emailed and made a new proposal to AXISS. Gefteas proposed that AXISS send him an additional $10,485.00 of AGS products which he would then add to his system. Gefteas said he would do two follow-up videos about his AGS product experience, post un-boxing pictures on his Facebook page, and make additional postings to promote AGS. In exchange, Gefteas proposed to keep all of the additional AGS product for free as compensation for posting the new videos, pictures, and promotions of AGS products.

14

82.     On information and belief, Gefteas accepts free products he receives for reviews, sometimes keeps these products for his personal use, and sometimes sells them directly or through intermediaries in order to make income for his promotional work.

83.     On information and belief, Gefteas further enriches himself via Bespoke.

84.     Gefteas started Bespoke at the beginning of 2026, in the middle of the events chronicled in this lawsuit.

85.     Bespoke purports to be a consultation business. On information and belief, by consulting with buyers and then recommending certain dealers to sell equipment to the buyers he consults with, Gefteas is able to facilitate the sales of the products he receives for his reviews and promotions.

86.     On information and belief, Gefteas uses Bespoke to refer business to Suncoast and for products imported and distributed by Luxury, including Clarisys which is owned by Bovaird and Wiegand.

87.     In fact, Gefteas all but admitted he directs his customers to Suncoast on November 7, 2025 when he posted that Suncoast is one of only two dealers from which he purchases.

88.     On information and belief, Gefteas is compensated for the buyer referrals he makes via Bespoke, including the referrals he makes to Suncoast and for products imported and distributed by Luxury, including Clarisys which is owned by Bovaird and Wiegand.

89.     The Bovaird Defendants and Gefteas Defendants thus conspired to perform the events chronicled in this lawsuit in order to harm AXISS and enrich themselves.

90.     The AXISS team concluded that Gefteas's ask for more than $10,000.00 of free products was outside of normal industry standards and that AXISS should pass on this offer.  But when Goldsby delivered that response back to Gefteas, he became angry, stated that he deserved

15

to be paid more for his review work, and noted that AXISS's competitors were giving him free products for doing their reviews.

91.     Gefteas then demanded the refund of the $2,958.30 second payment for the discounted AGS products. When Goldsby responded that the AGS deal had already closed out and there was no justification to renegotiate it, an enraged Gefteas told Goldsby that AXISS must pay more for Gefteas to continue performing positive reviews for AXISS products.

92.     AXISS then decided it could consider some form of monthly sponsorship to support future work, but before negotiating that option, Gefteas told Goldsby that if he did not get a refund of the $2958.30 then he would return Gauder Akustik speakers he had just received for review and no longer review any future products for AXISS.  Gefteas also implied that it would be harmful for AXISS's reputation if the partnership ended on bad terms and pressured Goldsby to find some way to get that payment refunded.

93.     Pressured and intimidated by Gefteas, and concerned about the damage that Gefteas could cause, Goldsby personally made two cash payments equal to 25% of the amount that Gefteas was demanding ($1,479.15 in total) via Zelle. These payments went to Gefteas through an account that belonged to Gefteas's wife.  But those personal payments did not appease Gefteas.  Instead, Gefteas refused to publish his review of the pair of Gauder Akustik speakers and thereafter began to systematically criticize AXISS and its products.

94.     In fact, Gefteas ultimately posted on May 12, 2026 that the Gauder Akustik speakers are the "worst speakers" he ever heard, "absolutely lifeless, emotionally disconnected … I never had a positive impression of it in any way."

95.     So Gefteas fulfilled his threat and, when AXISS refused to pay him, decided to refer to a product by one of AXISS's brands as the worst he ever heard.

16

96. As alleged below, that negative review came during a time when Gefteas has been actively defaming AXISS and its products as part of the conspiracy involving the Bovaird Defendants and the Gefteas Defendants.

97. After Goldsby paid Gefteas only $1479.15 instead of the $2958.30 he demanded, Gefteas immediately stopped writing positive reviews of AXISS and the products AXISS carries. To the contrary, Gefteas began to regularly and systematically criticize AXISS brands such as Soulution, Gauder Akustik, and Accuphase.

98. At the same time Gefteas criticized AXISS and its products, he praised the Bovaird Defendants, including Luxury and its products. For example, in just a four week period from August 11, 2025 to September 8, 2025, Gefteas praised and promoted the Bovaird Defendants and their products no less than 16 times in videos and on his Facebook page.

99. Likewise on November 7, 2025, Gefteas praised both Clarisys and Suncoast and noted that Suncoast is one of only two dealers that he buys from.

100. Meanwhile, Bovaird suggested in a public video posted in late January of 2026 that he gave away free Clarisys products to YouTube reviewers as a better form of marketing than advertisement.

101. Gefteas does his reviews on YouTube and has performed multiple reviews and promotions showing himself in possession of two expensive sets of Clarisys speakers.

102. Gefteas regularly claims that he receives no compensation for his reviews.

103. That claim is false, as shown by the payments and free products that Gefteas demanded and received from AXISS and by Gefteas having told AXISS that AXISS competitors give him free products.

17

104. Moreover, given Bovaird's statement that he provides free product to YouTube reviewers and Gefteas's many positive reviews and promotional postings of the Boviard Defendants and their products immediately following AXISS's refusal to continue paying Gefteas, coupled with Gefteas's demand for over $10,000.00 in compensation from AXISS for a positive review and package promotional postings, Plaintiff pleads on information and belief that the Bovaird Defendants have paid Gefteas in excess of $100,000.00 for positive reviews and promotions of their businesses and the products they sell.

**Suncoast Breaches the Authorized Dealer Agreement,**
**and AXISS Fixes Suncoast's Customer Service Failure**

105. In October 2024, Suncoast submitted a purchase order and made deposits for one Soulution 727 preamplifier and two Soulution 717 power amplifiers. This was a "pre-order" of the newest Soulution products, some of which were in the final stages of development.

106. The 727 shipped in late 2024 and was installed in December at the home of a customer in Malibu, California whose online name is PK-LA.[2] The 727 worked without any problems, and PK-LA said it was the best preamplifier he had ever used in his system.

107. The Soulution 717 amplifier became available to ship in June 2025.

108. Suncoast asked AXISS to arrange for the 717's to ship directly from the Soulution factory to PK-LA.

109. Suncoast told AXISS that it had agreed to coordinate with PK-LA and to assist him with installing the 717 amplifiers, once they arrived. AXISS provided Suncoast with shipping details and tracking numbers.

---

[2] To protect the personal privacy of the customer, Plaintiff refers to this customer by his online name, PK-LA. The name and identity of the customer is well-known to all Defendants as detailed by their many statements and actions alleged in his lawsuit.

110. But Suncoast breached its agreement with AXISS and PK-LA and failed to travel to California to support its customer with the installation.

111. Assistance with installation, especially for a high-end product like the Soulution 717s is a common service provided by dealers in the industry and expected for any retail sale above $250,000.00. That was particularly true here where AXISS arranged for the products to be shipped directly to the customer in reliance upon Suncoast's promise that it would handle the installation.

112. Having received no assistance or training from Suncoast, PK-LA attempted to set up and install the Soulution 717 amplifiers himself starting on or around July 1, 2025.

113. On July 2, 2025, PK-LA called Cliff Duffey and informed him that, at some point during the installation and setup of one of the Soulution 717s, a speaker binding post had broken in half. This rendered that amplifier unit inoperable and in need of repair: a standard issue covered by warranty. Duffey told PK-LA that AXISS would arrange to have that repaired.

114. Other than the broken binding post, AXISS was not aware of any issues with the Soulution products or PK-LA's setup.

115. On July 5, 2025, Bovaird informed AXISS that there was a problem with the Soulution products in PK-LA's possession.

116. On information and belief, the problems with the products arose because of Suncoast's failure to properly install the products, according to its agreement obligations with AXISS.

117. Bovaird and Suncoast breached their contractual promise to install the Soulution products, upon which AXISS relied.

118. The Agreement specifies that AXISS offers no implied warranties and excludes all claims for damages by Suncoast except to repair or replace products at AXISS's option.

19

119. The reason for these limitations is that warranties in the high-end Hi-Fi audio market are provided by the actual manufacturers of products. Typically a warranty requires the manufacturer to repair or replace any audio product that is damaged or does not otherwise operate as promised.

120. While a refund is possible if a product defect cannot be cured, that refund is provided by the manufacturer only after the manufacturer is given a reasonable period of time to repair or replace the product.

121. In breach of the Agreement and against industry practice, Suncoast never gave Soulution (or AXISS) a reasonable period of time to analyze the products for fault or to repair or replace the product.

122. To the contrary, on July 5, 2025, Bovaird texted TJ Goldsby of AXISS and told him that the sale to PK-LA would have to be undone.

123. In other words, the first time AXISS heard of a possible issue other than on the amplifier with the broken post came in the form of a demand that it take all of PK-LA's Soulution products back—not that it repair or replace them as the Soulution warranty provides.

124. Bovaird advised Goldsby that AXISS needed to take the products back from Suncoast and provide a refund to Suncoast. Bovaird implied that AXISS would suffer severe legal and reputational harm if it did not immediately agree.

125. The demand was a complete shock to AXISS as there had been no inquiry to AXISS for support of a possible product defect or fault on either of these two Soulution products..

126. After some back and forth, Bovaird informed AXISS that PK-LA's Rockport Lyra speakers had been damaged.

20

127. Although it was too early at this stage to know the cause of such damage, Bovaird put the blame on Soulution products and failed to provide any support to PK-LA or AXISS to investigate the actual cause of the damage to PK-LA's speakers. In doing so, Bovaird in his role with Suncoast, violated Sections 3.6 and 3.7 of the Agreement.

128. Although Bovaird demanded an immediate refund, Cliff Duffey and Steve Huntley of AXISS informed Bovaird that AXISS would need to determine if there was anything wrong with these Soulution products and if they had actually caused damage to PK-LA's speakers.

129. On July 15, 2025, Bovaird, Duffey, Huntley, and PK-LA met at PK-LA's house.

130. Huntley intended to do on-site testing of the audio equipment and speakers, but that was not possible because PK-LA had dismantled his system and packed up the Soulution products. AXISS therefore shipped the Soulution products to Nashville, Tennessee for testing.

131. After extensive testing, which included connecting PK-LA's Soulution products to AXISS's own pair of Rockport Lyra speakers (replicating the exact system set up in PK-LA's house), and streaming music at a high volume for 50 hours, playing the exact album PK-LA was listening to, AXISS was able to confirm that the Soulution products were not at fault for damage to PK-LA's speakers.

132. While AXISS was able to rule out the Soulution products, it could not otherwise identify what else in PK-LA's system might have caused the problem.

133. AXISS informed Bovaird and PK-LA on July 30, 2025 that testing had confirmed the Soulution products did not cause the damage to PK-LA's speakers.

134. At the same time AXISS was testing the Soulution products, Bovaird was actively asking AXISS for more Soulutions products, including 717s and 727 for him to sell to customers.

21

135. Once it was confirmed that there was nothing wrong with the 717s, Bovaird could have taken those products back from PK-LA and sold them to another client.

136. There was no need for a refund.

137. But Bovaird did not take the (now confirmed to be without defect) Soulution products back. He insisted that AXISS refund him the price and take the products back.

138. Incredibly, while Bovaird was insisting upon a full refund, he was also inquiring about availability of these same products for Suncoast to purchase and sell to their other interested customers. So instead of Suncoast reselling the returned PK-LA products for a substantial profit, they were demanding and received a remedy that was outside of their Dealer Agreement with AXISS.

139. The next business day following the refund, Bovaird called Cliff Duffey and asked to re-purchase the returned products at a substantial discount to the amount of the refund. Duffey informed Bovaird that there was a backlog of other Soulution dealers with deposits who had already asked if they could purchase the returned products and that they could not be sold back to Suncoast for a discount. This greatly enraged Bovaird who then told Cliff Duffey that he had already had customers who were expecting to purchase those from Suncoast based upon AXISS selling them back to Suncoast at substantial discounts.

140. Although there was no problem with the Soulution products, on July 15, 2025 Duffey, Huntley Bovaird, PK-LA and his girlfriend, and Ron Resnick (a friend of PK-LA) met at PK-LA's house and a nearby restaurant to address PK-LA's concerns.

141. PK-LA stated that he wanted Suncoast to take back the Soulution products and give him a full refund. PK-LA also stated that he values his personal privacy and wished for this to remain confidential.

22

142. All parties agreed to keep the details of PK-LA's purchase, experience, and transaction confidential.

143. In reliance upon Bovaird and Suncoast's promise to keep things confidential, AXISS agreed to consider a refund to Suncoast so as to help Suncoast and PK-LA and began negotiations.

144. But as AXISS considered what it would do, while at the same time testing the Soulution products for fault, Bovaird threatened AXISS with reputational harm if it did not give a refund.

145. Bovaird made these threats even though Suncoast contracted in section 8 of the Agreement that it does not have a warranty or claim for damages against AXISS.

146. Bovaird stated that PK-LA would sue AXISS and cause AXISS reputational harm if it did not issue a full refund.

147. This was untrue. PK-LA never threatened to sue AXISS and in fact stated that he wished to avoid a lawsuit.

148. Later, long after AXISS issued a refund, the Bovaird Defendants repeated the lie that PK-LA was considering legal action against AXISS. That has never been the case.

149. Even though one 717 amplifier was quickly repaired under warranty and the other was found to not have faults, AXISS eventually agreed to take back the 717 amplifiers and give Suncoast a full refund. As for the 727 that PK-LA had been using since December of 2024, AXISS agreed to take that back and refund its price too minus a standard industry restocking fee, given that it had been in use for eight months.

23

150. Even though Suncoast had no claim for a refund—and indeed Suncoast was at fault for breach of its contractual promise to perform the installation itself—Bovaird was enraged that AXISS would charge an industry-standard restocking fee.

151. Ultimately, on August 1, 2025, AXISS, Suncoast, and PK-LA agreed that AXISS would refund Suncoast for the 717s and refund Suncoast for the 727, minus the restocking fee, and Suncoast would in turn refund PK-LA the full amount for the 717s and the price of the 727 minus the AXISS restocking fee.

152. Once again the parties all agreed that confidentiality was important. AXISS relied upon Bovaird / Suncoast's promise of confidentiality in agreeing to this refund that it had no contractual obligation to give.

153. On August 1, 2025 the parties sent respective wires—AXISS to Suncoast, Suncoast to PK-LA—to complete the agreed upon refund.

**The Bovaird Defendants Slander AXISS to its Dealers**

154. Immediately after the refund, Bovaird and Wiegand began to slander AXISS. They did this despite having just learned that testing showed the Soulution products were not at fault.

155. In early August, 2025, Wiegand in his role as owner and manager of Clarisys, and as part of a conspiracy among all the Bovaird Defendants traveled to Colorado and slandered AXISS by telling an AXISS dealer in Colorado that an amplifier had destroyed a customer's speakers and that AXISS had refused to give a refund.

156. Wiegand did this intentionally in order to interfere with AXISS's relationship with its dealer and AXISS's relationship with Soulution.

157. It was in Clarisys's business interests to try to discredit Soulution.

24

158. Wiegand could not have known of the PK-LA situation unless Bovaird breached his promise of confidentiality.

159. And to the extent Wiegand knew about the PK-LA situation from Bovaird, then he knew or should have known that the Soulution products did not cause the problem because the testing was complete and had already been reported to Bovaird.

160. On information and belief, Wiegand and Bovaird conspired to share the false information Wiegand conveyed to the dealer in Colorado.

161. That same Colorado dealer was later told by Bovaird that a 717's circuit boards "had solder dripping off them" which caused a short circuit in one of PK-LA's amps.

162. Solder is a metal alloy used in some circuit boards that, if used incorrectly, can cause a circuit board to break.

163. This was false, and Bovaird knew it was false, because AXISS had just provided Bovaird with photos of the circuit boards showing that the boards were made with no solder used on the underside of the circuit boards and that there was no solder defect.

164. Later that same month, Wiegand was in Utah repairing a broken pair of Clarisys speakers.

165. AXISS's dealer was present with Wiegand and the customer.

166. When the customer told Wiegand he had a strong interest in Soulution 717's, Wiegand told the customer not to buy 717's because they were defective and had blown up a customer's speakers. Again, Wiegland knew or should have known that these statements were false.

167. Based on Wiegand's false story, that customer chose not to buy any Soulution products.

Case 3:26-mc-09999    Document 648    Filed 07/02/26    Page 25 of 48 PageID #: 30468

168. Later, Dave Weintraub, a sales representative of Luxury and Clarisys, called that same Utah dealer and told the dealer he should drop Soulution products because the 717 was defective and blowing up speakers. Weintraub knew or should have known that these statements were false.

169. AXISS learned about these conversations because its dealers called it to ask about the Bovaird Defendants' false allegations.

170. Wiegand's statements were false. The Soulution amplifier did not destroy PK-LA's speakers. Nor was it true that AXISS would not give a refund since AXISS did give a refund. (And the refund was, ultimately, was the responsibility of the dealer, Suncoast.)

171. Bovaird breached his promise of confidentiality upon which AXISS relied when it engaged in negotiations for a refund.

172. But these instances of slander and intentionally interference with AXISS's business relationships were just the first of many by the Bovaird Defendants.

**The Bovaird Defendants Slander and Defame AXISS in the Audio Industry**

173. The Bovaird Defendants slandered and defamed AXISS to Jay Caceres, on Audioshark, and at the Florida Audio Expo.

174. These actions were in violation of the Agreement and the law.

175. Through these actions the Bovaird Defendants intentionally interfered with AXISS's business relationships with its dealers, Soulution, and customers.

*Jay Caceres*

176. On information and belief, the Bovaird Defendants slandered and defamed AXISS to Jay Caceres.

26

177. Caceres is the owner and operator of Jay's Audio Lab, a business that does reviews of high-end Hi-Fi products, provides private consultation to individual buyers for a fee, directly sells high-end Hi-Fi equipment, and brokers the sales of high-end Hi-Fi equipment to third parties for a fee.

178. Caceres is one the largest social media influencers in the high-end Hi-Fi space with over 40,000 YouTube followers, 1,400 followers on Instagram, and 1,700 subscribers on Facebook.

179. Caceres also does substantial business with the Bovaird Defendants by buying products from the Bovaird Defendants to sell to his customers, arranging consignment sales of used products for the Bovaird Defendants, and brokering new buyers that he brings to Suncoast.

180. On information and belief, on or about August of 2025, Bovaird knowingly slandered AXISS to Caceres by telling Caceres the same false story Bovaird and Wiegand were telling AXISS dealers about the speakers. Bovaird did so knowing that Caceres had a large platform in the industry and that this disparaging information would harm AXISS's reputation and business.

181. Caceres, having heard this false story, then later talked two customers out of buying Soulution products.

182. As alleged below, Caceres admitted these facts on a YouTube show on May 10, 2026.

*Audioshark*

183. Bovaird operates and owns Audioshark, a members-only online forum for discussion of high end Hi-Fi products.

27

184. On information and belief, Bovaird has defamed AXISS by sharing sharing false stories about the PK-LA situation and Soulution speakers with members on Audioshark.

185. On information and belief, Bovaird has slandered AXISS by telling false PK-LA facts to members of Audioshark.

*Florida Audio Expo*

186. Bovaird owns and operates a for profit annual industry tradeshow call the Florida Audio Expo.

187. At the annual show from February 20-22, 2026, Bovaird hosted a large Clarisys demonstration room in which he personally demonstrated products.

188. During the show, Bovaird regularly told customers who came to his demonstration room the false story that Soulution 717 amplifiers had damaged PK-LA's speakers and that AXISS and Soulution was knowingly shipping defective products and covering up the truth.

189. AXISS learned this from a Soulution client who was told these claims directly from Bovaird and was now concerned about how these claims could affect the value of the Soulution products he had recently purchased.

**The Bovaird Defendants Conspire with the Gefteas Defendants to Defame AXISS in Violation of Law and the Agreement**

190. In addition to the defamation and slander they engaged in directly, the Bovaird Defendants slandered and defamed AXISS to Gefteas.

191. Bovaird's statements to Gefteas were in violation of the Agreement, as well as his promise of confidentiality as to the PK-LA situation.

192. During the negotiations with PK-LA, the day before the deal was finalized, Gefteas teased the story with a "Greek Coded Cryptic Message" stating, "Remember your reputation and taking care of a customer is more important than being 'right' 33if you are to stay in business."

28

He responded to comments on the post stating, "In this case—which I will not talk about publicly—it's pretty shocking behavior by the distributer and manufacturer. Even in my jaded world it's like they took extra-stupid pills." *See* 7/31/25 posting, attached as **Exhibit 3.**

193. On August 1, 2025, within hours after the final closing of the PK-LA transaction— and at a time when no one knew of the PK-LA transaction except AXISS, PK-LA, and the Bovaird Defendants—Gefteas posted to all of his followers that the expensive amp blew up and ruined expensive speakers, the amp company has a "history of defective products" and that the distributor tried "to stick it to the owner" and refused to do the right thing.



194. While Gefteas didn't explicitly name either AXISS or Soulution, the highly experienced and specialized subscribers and viewers of The Greek Audio Geek social media pages could only have understood that Gefteas was referring to AXISS and Soulution because of the way Gefteas described the products and the parties involved. For example, he mentions a "six-figure system failure" and that the distributor is located in the United States (AXISS is the exclusive distributer of Soulution in North America). Gefteas also later posted a picture of a "failed amp" and any audiophile familiar with the industry would have recognized that product as the Soulution 717.

195. Gefteas could have only gained information about the PK-LA deal from the Bovaird Defendants as no one was privy to that information except for Bovaird, PK-LA and those associated with AXISS.

196. When the Bovaird Defendants, especially Suncoast, shared such information with Gefteas they engaged in activities that reflect adversely upon AXISS in violation of the Agreement.

197. Gefteas amplified and added detail to his false narrative by calling the distributor (AXISS), "greedy," "stupid," and "arrogant." He claimed that the distributer could have made the customer whole but instead "chose to make the customer lose a substantial sum of money." He then added, "Honestly this would be a fantastic project as a case study in Business School of everything not to do. If I didn't personally know the players in this, I would not believe what I've heard as I frankly can't believe anyone is that stupid."

198. Claiming that the amp blew up and damaged the customer's $250,000 speakers, Gefteas repeated the false claim in comments that the company's products "have a long history of repeatedly failing." He even went so far as to state that the "blow up" was witnessed by another person and "there may be injuries as well." He boldly states, "I know the full circumstances. There

30

were multiple witnesses and possible physical injuries as well." Several times he refers to the customer as a "victim" implying that AXISS took advantage or even hurt this individual.

199. Despite his familiarity with the industry and knowledge that any refund, if issued, was between the customer and the dealer (Suncoast), not the distributer, Gefteas repeatedly stated that the distributer did not make the customer whole. For example, he wrote, "Remember—being a bad or good distributer is a conscious and calculated choice each makes on its own. In this instance they chose the path this took. They could have easily made this very easy and chose not to."

200. None of the comments or posts mentioned the dealer, Suncoast, at all, even though the transaction was ultimately between Suncoast and the customer. *See* Comments to 8/1/25 Facebook posting, attached as **Exhibit 4.**

201. The posts and comments were false and misleading because AXISS did provide a refund to Suncoast, despite not having any obligation to do so, but any refund to the customer was solely a matter for the dealer, Suncoast.

202. Further, the Soulution amplifiers did not blow up and were proven to not have caused damage to the customer's speakers. The customer's 727 preamplifier and 717 power amplifier were thoroughly inspected, analyzed, and tested with the same model of speaker as the customer's for over 50 consecutive hours high volume use. Throughout all of this testing, AXISS could not find any fault with PK-LA's 727 preamplifier or 717 amplifier. It was also confirmed through testing that none of PK-LA's Soulution products had "blown up" and there were no physical injuries or victims either.

203. The Bovaird Defendants orchestrated the public release and publication of this false information in violation of the Agreement.

31

204. Gefteas knew or should have known that these statements related to the PK-LA situation, the products, and AXISS were false because, as someone knowledgeable about this industry, Gefteas would have known that a refund, if given in part or in full, would be from the person the customer contracted with—i.e. the dealer—and not the distributor.

205. Gefteas also knew or should have known that the amps did not blow up, there were no victims, and that there was no evidence to support the claim that the amplifier destroyed the customer's speakers.

206. Gefteas had worked with Bovaird, promoting his products for pay, and knew or should have known that it was Bovaird and Suncoast, not AXISS, who could have made the customer whole but chose not to. After all, Gefteas could only have found out the details of this entire situation from Bovaird himself.

207. The posts stating that AXISS "stuck it" to the customer and made a conscious choice to not "do the right thing," engaged in unethical and poor customer service, did not refund a customer, and knowingly sold faulty equipment is significantly and seriously damaging to AXISS's reputation as a small business with a tightknit community as a customer base. As evidenced by the damages in this case, the reputation in this industry and the reliability of equipment is essential to any future sales.

208. Gefteas knew Duffey and others at AXISS and had plenty of contacts in the industry to find out more about the PK-LA transaction or to inquire about details regarding the refund, whether the Soulution amplifiers were actually the cause of customer's speaker damage and if there was any truth to claims of the amplifier blowing up or causing physical harm. Upon information and belief, Gefteas did not bother to confirm or verify any details and instead only

32

relied on the self-serving story provided by the Bovaird Defendants and/or fabricated his own information about the incident.

209.    After seeing several false and defamatory posts and comments, Ron Resnick, with PK-LA present and witnessing, called Gefteas to make sure he understood that his claims were not accurate and based on false information, and that PK-LA did not want his story to be made public and falsely used for ulterior motives.

210.    Despite this explicit warning by someone directly involved in the transaction, Gefteas ignored what he then knew to be false and continued posting about AXISS failing to provide a refund to an unhappy customer, as well as false statements about the Soulution 717 amplifier blowing up, causing harm, and damaging that customer's speakers.  Gefteas also did not delete any of his false and defamatory comments, including those where he stated that he knew all of the circumstances, or even posts stating that there were physical injuries.

211.    AXISS is the exclusive supplier to Authorized Soulution Dealers in North America, and the consistent false and defamatory posts about product defects and poor support by AXISS has led to a significant decrease in sales.  In fact, sales of the disparaged Soulution products have dropped over 88% since the start of the defamation.

212.    The false and defamatory statements have caused a number of AXISS's Authorized Soulution Dealers to drop the Soulution brand and have impeded the ability of AXISS to add new dealers for Soulution and other AXISS brands as new dealers don't want to represent what has been publicly called a defective product or associate or affiliate themselves with a distributor with a poor reputation.

213.    The reputational damage has also hampered AXISS's ability to sell other brands or to gain new brands for distribution.  Other brand representatives have called AXISS inquiring

33

about the false statements and have expressed hesitation in doing business with AXISS because of the reputational harm.

214. These harms to AXISS are a direct result of the actions of the Bovaird Defendants and Gefteas Defendants, who conspired together to engage in this smear campaign.

215. In February of 2026, Gefteas again posted false and defamatory information about AXISS, implying that AXISS had lost AIRTIGHT, a key brand, because of AXISS's poor reputation and customer service. In fact, to the contrary, AXISS and AIRTIGHT ended their thirty year successful partnership amicably for a variety of business reasons. AIRTIGHT notified its dealers and customers through a gracious letter announcing the change. *See* AIRTIGHT Letter, attached as **Exhibit 5.**

216. Instead of posting the exact letter, Gefteas posted a doctored version of the letter with several words and lines of text missing. *See* Altered Letter, attached as **Exhibit 6.** The Altered Letter omitted many positive references to AXISS and AIRTIGHT's statements about its appreciation of the partnership with AXISS. Then, after publishing a false, doctored letter Gefteas then added a post about how this brand chose to switch distributors to leave a distributor (AXISS) who had less care, knowledge, and respect for the craft. *See* Feb 9 post, attached as **Exhibit 7.**

217. A few days later, Gefteas, in response to a post from Ron Resnick calling out the Altered Letter as false, stated that Resnick called him months ago about a significant situation involving AXISS and Soulution. Gefteas stated that the situation caused him to be glad he did not own Soulution gear and gave him reservations about AXISS. Gefteas went on to state that the fact that AIRTIGHT moved away from AXISS suggests that there were legitimate issues with AXISS.

218. Gefteas didn't hold back this time. Instead of just calling out a "distributor", he named AXISS and Soulution explicitly. This now gave the public confirmation of who was

34

involved, for those who did not already know from the previous posts, and provided incentive for those not familiar with the first false narrative to look at Gefteas' previous defamatory posts for more information.

219. Again, Gefteas was well-aware at this point that the speakers did not blow up and did not cause damage to the speakers, that there were no injuries, and that AXISS, the distributer, was not responsible for the refund to the customer. Gefteas also was aware, as it was in the public domain, of the reasons for the AXISS and AIRTIGHT separation as stated in the original letter, which was widely distributed.

220. Gefteas knew or should have known that the information above was false and defamatory, but he posted it anyway to thousands of people, all of whom are potential customers.

221. These statements damaged AXISS's ability to sell not only Soulution products but also other brands as all of these defamatory statements eroded AXISS's reputation in the industry.

222. In an effort to try and repair its reputation, AXISS publicly posted two explanations detailing what occurred with the PK-LA incident. *See* AXISS posts, attached as **Exhibit 8.**

223. PK-LA even published his own public account of what occurred—a narrative that did not include a story of the 717 amplifiers blowing up or any injuries. PK-LA also stated that AXISS had done testing on his exact Soulution products in a near replica of his system and could not reproduce what he had experienced. *See* PK-LA post, attached as **Exhibit 9.**

224. Once again, Gefteas received information regarding the dispute directly from the parties involved, including the customer himself. Despite having this information, Gefteas did not amend or delete any prior posts or comments even though he knew at this point that the posts were false and defamatory.

225. Not only did not he not revisit his prior posts, Gefteas continued to promote these false and defamatory statements.

226. In May of 2026, Gefteas claimed he was getting messages from Soulution customers with failing solution amps. He wrote, "This predates the recent issue where an owner went public about his brand new six-figure Soulution system failed after only an hour and supposedly took out his $250,000 speakers." *See* May post, attached as **Exhibit 10.** Again, referencing the past posts with the same hashtags led readers again to the trail of prior defamatory posts, making them relevant and visible again, and harming AXISS and Soulution again.

227. In comments to this post, Gefteas discussed a Soulution amp and referenced a US distributor, knowing AXISS is the only U.S. distributer of Soulution products. He commented, "It's too bad the customer here in the US with his failure of the brand new units mentioned above was never made financially right by the US distributer (so say people in the know). I can't imagine doing that to a customer if true. Imagine not giving him 100 percent of his money back immediately?" *See* May comments, attached as **Exhibit 11.** Gefteas made these comments despite knowing that it was Bovaird's Suncoast Audio, the dealer, who decided to not give the customer a full refund.

228. As the comments went on, he got bolder: "Cliff Duffy at Axiss CHOSE to NOT REFUND the owner of the new gear that damaged the Rockports (speakers) all his money back. The owner had to threaten to sue at the dinner table he took them to and at that only got SOME of this money back. Ask Cliff about the admission he made at dinner regarding the known quality of parts used in Soulution. Ask Cliff why he didn't refund the buyer 100% of his money after the near immediate failure. Any other reputable company would have immediately." See Comment, attached as **Exhibit 12.**

36

229. The comments again perpetuate the false and defamatory narrative which could only have come from the Bovaird Defendants, as they were the only ones at the "dinner table" not affiliated with Axiss or PK-LA.

230. This further illustrates that a conspiracy exists between the Bovaird Defendants and the Gefteas Defendants.

231. It also illustrates the breach of the Agreement by the Bovaird Defendants who consistently engaged in activities that reflect adversely upon AXISS.

232. A few days later, Gefteas was back at it again. He wrote: "However when something so expensive fails within a day of receiving it (and damages other gear), an honest reputable distributor would simply apologize and return 100% of the purchase price to the victim." *See* comments, attached as **Exhibit 13.**

233. These false statements were picked up by others and caused direct harm to AXISS.

234. Again, Gefteas made these statements over and over again with full knowledge that Suncoast, not AXISS, chose not to fully refund the customer and that the incident as described had in fact, not happened at all.

235. For example, on May 10, 2026, Jay Caceres stated that he shared these stories with two interested Soulution buyers who then decided not to purchase sets of Soulution products.

236. At face value, this means AXISS lost at least two sales because of Caceres convincing customers not to buy.

237. On information and belief, Caceres did this because of false information provided to him and/or published to the world by Defendants.

238. As recently as June 24, 2026, Gefteas posted a YouTube video where he again reiterates that a customer's equipment blew up and a US Distributer (AXISS) failed to give him

37

one hundred percent of his money back. *See* YouTube video, available at, [Facebook is BLACKMAILING Content Creators - A Real Life Example #Hi-Fiaudio](#).

239. The allegation that a Soulution amplifiers "blew up" and caused damage to speakers is false, and Gefteas knew it.

240. This telling and retelling of this false narrative, despite knowing the actual facts involved, is severely damaging to AXISS's reputation, especially considering Gefteas's audience with specialized knowledge.

241. The reputational harm is immense, as Gefteas claims to have direct knowledge of intimate conversations and claims that AXISS is dishonest, did not make a customer whole, and is engaged in unethical business practices.

**Defendants Intentionally Interfere with AXISS's Business Relationships**

242. AXISS has valuable relationships with its dealers, the brands it imports and distributes, and the end customers who support the dealers and brands (and thus AXISS) through their purchasers.

243. These dealers and brands are all known to Defendants.

244. The Bovaird Defendants know the dealers because they work with many of the same dealers to sell their products, including Clarisys.

245. The Bovaird Defendants also know the dealers because they try to bring the dealers on as dealers of their products.

246. The Defendants know AXISS's brands because they are published on the AXISS website and discussed regularly by publications in the audio industry.

247. Defendants set out to systematically interfere with or even destroy AXISS's business relationships.

38

248. For example, both Wiegand (himself and on behalf of Clarisys) and Bovaird (himself, and on behalf of Luxury and Clarisys) defamed and slandered AXISS repeatedly to its dealers.

249. Wiegand and Bovaird intentionally and repeatedly slandered the Soulution 717s.

250. Gefteas repeatedly defamed both AXISS and Soulution, while also disparaging other AXISS brands like Gauder Akustik.

251. Bovaird shared confidential information with Gefteas and Wiegand which they each published.

252. Gefteas and Bovaird each tried to intimidate AXISS to pay them money, give free product, or issue refunds.

253. Together, all of these acts were improper motives and means designed to interfere with AXISS's business relationships and destroy it as a competitor to Luxury and its brands as competitors to Clarisys.

254. These improper means were effective and caused a dramatic drop in sales, especially for the Soulution 717s and Gauder Akustik speakers which dealers are refraining from purchasing from AXISS, thus interfering with both the dealer relationships and the distributor relationship with Soulution and Gauder Akustik.

### Defendants Conspire to Harm AXIS and Benefit Themselves

255. Moreover, this was all part of a conspiracy.

256. Bovaird, Wiegand, and Gefteas, together with the entities they control, all agreed to work together to defame and slander AXISS and its products and interfere with AXISS's business relationships for the express purpose of destroying AXISS so as to benefit themselves.

257. Bovaird is at the center of the conspiracy.

258. Bovaird shared confidential information with Wiegand and Gefteas which they could have obtained only from Bovaird.

259. Gefteas then published false information based on the confidential information from Bovaird.

260. All the while Bovaird compensated Gefteas through free or reduced products and other means. In exchange for this compensation, Gefteas repeatedly published false information and continued to do so even when others, including PK-LA and Ron Resnick, told him that what he was saying was false.

261. Gefteas benefits from the payments Bovaird makes to him and from the business he does with Bovaird and Bovaird's entities (Suncoast, Luxury, and Clarisys) both directly and through his sole proprietorship, Bespoke.

262. Bovaird, Wiegand, and their entities all benefitted by harming sales of Soulution products, especially the 717s and Gauder Akustik and other AXISS products, thereby increasing the market for Clarisys products and other products imported and distributed by Luxury and sold by Suncoast.

263. The purpose of the conspiracy was to harm AXISS, Soulution, Gauder Akustik, and other AXISS brands while benefitting Defendants, a goal that the conspiracy achieved.

**AXISS Suffers Substantial Damages**

264. Defendants' actions have profoundly damaged AXISS.

265. When AXISS compares the four-month period during the summer of 2025 when the Soulution 717s were first released (i.e. 2nd and 3rd quarter of 2025) to the sales that have taken place since Defendants began their conspiracy (i.e. 4th quarter of 2025 and 1st and 2nd quarters of 2026), AXISS sees a sales decline of 88.4% on Soulution 717 amplifiers.

266. This is a shocking, unheard of, and precipitous drop in sales, especially considering the awards and accolades that the Soulution 717 was receiving during that time.

267. It is a drop in sales unprecedented in the industry for a product of this type.

268. And yet it happened to a product that most of the industry has declared to be one of the greatest audio products of all time.

269. There is no explanation or reason for this to have happened but for Defendants' illegal acts and conspiracy.

270. In fact, but for the systematic conspiracy of the Bovaird and Gefteas Defendants, AXISS would have expected to see an increase in sales of 717s as the stellar reviews and awards led to sales growth and adoption in the industry, rather than the precipitous decline AXISS observed.

271. And AXISS's sales of other products have also been impacted in an amount to be show in discovery and at trial.

272. For example, sales of Gauder Akustik products—the same product Gefteas demanded payment to review then trashed as the "worst ever" speakers—are down over 70% in 2026 coincident with Gefteas's defamation and Bovaird's slander of AXISS.

273. Moreover, the ongoing damages to AXISS's reputation are profound and at this stage difficult to quantity.

274. Altogether AXISS pleads at least $1,800,000.00 in damages, which is a figure that grows every day given the ongoing repercussions of Defendants' illegal acts.

41

# I. COUNT ONE

## Breach of Contract (Against Suncoast)

275. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

276. AXISS entered into valid contracts with Suncoast.

277. These contracts include the Authorized Dealer Agreement and a contract that Suncoast would perform the installation of PK-LA's Soulution products.

278. Suncoast breached the Agreement in multiple ways, as alleged above, including Sections 3.7, 3.7, and 8, by engaging in activities that reflect adversely upon AXISS, failing to promote AXISS brands equally with other brands, such as Clarisys, and demanding a refund despite having explicitly agreed that it was not entitled to a warranty or damages.

279. Suncoast breached the agreement to install PK-LA's system when it failed to travel to California and perform the installation.

280. It was reasonably foreseeable at the time both contracts were entered that a breach of the contracts would cause consequential damages.

281. AXISS suffered direct damages from the PK-LA situation on account of Suncoast's breaches.

282. AXISS has suffered consequential damages from Suncoast's breaches of both contracts, including by Bovaird acting in his capacity as the owner and manager of Suncoast.

283. AXISS suffered additional damages through Bovaird's breach of his promise of confidentiality for the PK-LA discussions, a promise upon which AXISS relied.

## II.     COUNT TWO

### Defamation (Against the Gefteas Defendants)

284.     Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

285.     Beginning in July of 2025 and continuing to the present, Gefteas began posting and commenting on social media about AXISS and Soulution.  The posts and comments falsely discussed the PK-LA situation by stating that AXISS did not provide a full refund to PK-LA, did not provide acceptable customer service to PK-LA, and sold PK-LA a defective amp which blew up, damaged his speakers, and caused injuries.  While some posts and comments did not name AXISS directly, it provided enough context to the audiophile audience that most knew Gefteas was talking about AXISS.  Further, Gefteas later began directly naming AXISS,  defaming it and providing clarity for any subscribers who did not know AXISS was the target of the early posts.

286.     This story involving the refund, injuries, and a blown up amp were false.  AXISS did provide a refund to Suncoast and Suncoast was the party responsible for the refund to PK-LA as AXISS was not the dealer involved in the transaction.  The amp did not blow up or cause any injuries.

287.     At the time Gefteas made these posts and comments, all detailed above, he knew or should have known that the statement was false.

288.     At minimum, Gefteas failed to use reasonable care to determine the truth or falsity of the statements.

289.     Gefteas intentionally chose to make these posts and the posts and comments were meant to be understood and were understood to be defamatory and disparaging to AXISS.

290. Based on this series of posts and comments, AXISS suffered serious damages to both its reputation to its sales, of at least $1,800,000.00.

291. Gefteas's actions and conduct were directed at injuring AXISS's reputation.

292. Gefteas took these actions personally and in his role as sole proprietor of Bespoke so as to benefit Bespoke.

293. Gefteas acted knowingly, intentionally, recklessly, and with the intent to injure AXISS, thereby entitling AXISS to punitive damages.

## III. COUNT THREE

### Defamation and Slander (Against the Bovaird Defendants)

294. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

295. In August of 2025, Wiegand, as manager of Clarisys, traveled to Colorado and told an AXISS dealer in Colorado that an amplifier had destroyed a customer's speakers and that AXISS had refused to give a refund.

296. Bovaird then repeated that same false statement to the same dealer in Colorado.

297. A few days later, Wiegand again stated these same false statements to an AXISS dealer in Utah.

298. This fabrication that speakers were destroyed and AXISS had refused to give a refund was false.

299. Yet Bovaird repeated it again and again.

300. First Bovaird repeated the false statements to Jay Caceres.

301. Then he repeated the false statements to members of Audioshark.

44

302. Finally he repeated the false statements to visits to his demonstration room at the Florida Audio Expo.

303. Wiegand and Bovaird knew or should have known that these statements were false. After all, they were aware of the test results and had spoken with the customer himself.

304. At the very least, Wiegand and Bovaird recklessly made these statements without using reasonable care to determine the truth or falsity of this information.

305. This impulsive and false story told directly to dealers in Utah and Colorado, then to Caceres, then to posters on Audioshark, and finally to visitors to the Florida Audio Expo was meant to be understood and was understood by the dealers and customers to be defamatory and disparaging to AXISS.

306. Based on false statements, AXISS suffered reputational damage.

307. Wiegand and Bovaird's actions and conduct were directed at injuring AXISS's reputation as they knew that the information was defamatory and would be understood as defamatory.

308. As a direct and proximate result of this fake fraud story, AXISS suffered significant reputational damage with its dealers and suffered from a loss of sales.

309. The Bovaird Defendants, Wiegland and Clarisys acted knowingly, intentionally, recklessly, and with the intent to injure AXISS, thereby entitling AXISS to punitive damages.

## VI. COUNT SIX

**Intentional Interference With Business Relationships (Against All Defendants)**

310. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

45

311. AXISS enjoys existing business relationships with its dealers, its product manufacturers, and—indirectly through its dealers—and with the end customers who buy the products AXISS imports and distributes.

312. Each of the Defendants have specific knowledge of AXISS's business relationships. Defendants are all aware of AXISS's dealers including through direct business they do or consider doing (Luxury, Clarisys, Brspoke), competition with them (Suncoast), meetings and interactions with them (Bovaird, Wiegand, and Gefteas), and general knowledge about them.

313. Each of the Defendants has specific knowledge of AXISS's business relationships with its product manufacturers such as Soulution and Gauder Akustik because these relationships are exclusive to AXISS, listed on AXISS's website, profiled in media such as TAS, and otherwise generally known in the industry. Defendants also know AXISS's products because they compete with those products for sales.

314. The Defendants each intended to cause interference with AXISS''s relationships with its dealers and product manufacturers.

315. The Defendants each, either directly or via their owners, managers, and agents acting on their behalf used the improper means of defamation, slander, and misuse of confidential information for the predominant purpose of causing injury to AXISS and the products it carries for the purpose of enriching themselves.

316. AXISS has been damaged by Defendants' actions.

## VII. COUNT SEVEN

### Civil Conspiracy (Again All Defendants)

317. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

46

318. Defendants engaged in a common design to work together to harm AXISS as a business so as to improve their own business interest.

319. Each Defendant had the intent to engage in this common design and the knowledge of each other Defendant's common design.

320. The common design that the Defendants all engaged in was to accomplish, by concerted action, the unlawful purpose of intentional interference with AXISS's business relationships and/or the lawful purpose of gaining business through the unlawful means of defaming and slandering AXISS.

321. This common design was achieved through the overt acts alleged above including sharing (false) confidential information, publishing defamatory statements, slandering AXISS, and otherwise intentionally interfering with AXISS's business relationships.

322. The conspiracy has caused damaged to AXISS and its products.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court empanel a jury to try this action and enter judgment in its favor and against Defendants, jointly and severally as permitted by law, and award the following relief:

323. On the claims for breach of contract and civil conspiracy, compensatory damages according to proof, including consequential damages;

324. On the claims for defamation, slander, and intentional interference with a business relationship, damages according to proof as well as punitive damages;

325. Pre- and post-judgment interest to the fullest extent permitted by law.

326. Costs of suit;

327. Such other and further relief as the court deems just and proper.

47

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable.

Dated: July 2, 2026.

Respectfully submitted,

/s/ *Eric G. Osborne*
Eric G. Osborne, BPR No. 029719
Amy R. Mohan, BPR No. 031238
Sherrard Roe Voigt & Harbison, PLC
1600 West End Ave., Suite 1750
Nashville, TN 37203
Tel.: (615) 742-4200
eosborne@srvhlaw.com
amohan@srvhlaw.com

*Counsel for Plaintiff Veris Home Technology LLC d/b/a*
*Axiss Audio*

48